UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| USA, | Case No. 19-cr-00404-SI-1 |
| Plaintiff, | |
| v. | **SPECIAL FINDINGS OF FACT AND ORDER OF CONVICTION FROM BENCH TRIAL** |
| ALAN SAFAHI, | |
| Defendant. | |

This criminal prosecution arises from defendant Alan Safahi's tenure in the prepaid debit card business. In simplified terms, prepaid cards generally involve three layers: (1) a client who purchases the cards to be used by cardholders, (2) a program manager who services and sells the cards to clients, and (3) a sponsor bank who "issues" the card and settles card transactions with Visa, Mastercard, or Discover, using funds provided by the program manager. Alan Safahi founded Card Express, Inc. ("CardEx") in the mid-1990's to sell and service prepaid cards wholesale.

On August 22, 2019, the United States indicted Alan Safahi for allegedly defrauding CardEx's sponsor bank, Sunrise Banks, N.A., in 2013 and 2014 by "underfunding" the cards issued by the bank. Rather than transferring all money due to Sunrise Banks from CardEx's clients, the indictment alleges Safahi diverted funds to pay CardEx's debts and enlarge his personal wealth.

A superseding indictment was issued on January 27, 2022 alleging bank fraud, four counts of wire fraud, money laundering, and forfeiture. Dkt. No. 110. The Court concluded a bench trial in the action against Safahi on February 28, 2022.[1] On May 17, 2022, Safahi filed a request pursuant to Fed. R. Crim. P. 23(c), asking the Court to "state its specific findings of fact in open court or in a written decision or opinion." Dkt. No. 149.

---

[1] Trial transcripts may be found in the Court's docket at Dkt. Nos. 126–128 and 135–139. Safahi's written jury waiver pursuant to Fed. R. Crim. P. 23(a), and the Court's approval of the waiver may be found at Dkt. Nos. 105 and 106, respectively.

United States District Court
Northern District of California

Section I of this Order fulfils Safahi's request with Special Findings of Fact derived from evidence admitted at trial.  Section II of this Order sets forth the Court's determination of Safahi's guilt, finding the evidence presented at trial sufficient to fairly support a conclusion that every element of Counts One, Two, Three, Four, Five, and Six has been established beyond a reasonable doubt. The forfeiture allegation accordingly follows.

## I. SPECIAL FINDINGS OF FACT

### A. The Basics: CardEx and The KeyBank Debt

This subsection will describe: (1) CardEx's business and revenue model, (2) Safahi's ownership of, and control over, CardEx's operations between 2013 and 2014, despite his son Sean Safahi's serving as CEO, and (3) CardEx's ongoing obligations to KeyBank—Sunrise Banks' predecessor—after the termination of the KeyBank sponsorship agreement because of $2.25 million worth of unfunded prepaid cards for which KeyBank would have been liable.

**1. CardEx's Business Model and The Mechanics of Prepaid Cards**

CardEx was first incorporated in California in the mid-1990's as a domestic stock corporation to issue prepaid debit cards to other businesses.  3 Tr. 489;[2] Ex. D.  These other business—call them CardEx's "clients"—would then use the prepaid debit cards for various purposes, for example, "consumer incentives, distributor incentives, and employee incentives."  2 Tr. 353 (Westfahl Testimony).[3]  To obtain cards, clients would submit a purchase order specifying a card quantity and funding amounts, then wire money to a CardEx bank account to satisfy the

---

[2] Citations to the Trial Transcripts are denoted using "Tr." with the number preceding "Tr." designating the volume and the number succeeding "Tr." designating internal pagination. Accordingly, "3 Tr. 489" refers to Volume 3 of the Trial Transcript at internal page 489 and may be converted into the following ECF citation: Dkt. No. 128 at 120.

[3] Before trial, defendant submitted a Motion in Limine to exclude the testimony of Jamie Westfahl, Angela Montgomery, and John Tarazona as unduly prejudicial under F.R.E. 404(b). Dkt. No. 112. The Court finds the testimony of these witnesses relevant as to establishing essential context and does not find the testimony unduly prejudicial. The Court thus **DENIES** the motion.

purchase order.  7 Tr. 935.  But CardEx could not issue prepaid debit cards on its own.  Only "issuers" of Visa, Mastercard, and Discover cards are authorized to sell prepaid debit cards in the United States.  3 Tr. 387 (Tordsen Testimony).

Because banks are the only entities with the ability to act as "issuers," CardEx's business depended on the sponsorship of a bank to issue prepaid debit cards.  The sponsor bank's role in the prepaid card business is critical.  Every time a prepaid debit card is swiped, a "merchant's terminal" will forward transaction details to a payment processor such as Mastercard, Visa, or Discover.  7 Tr. 935 (Wiggins Testimony).  A payment processor, say, Mastercard, will then determine from whom it needs to seek approval for the transaction, based on the card's unique Bank Identification Number ("BIN").  7 Tr. 935.  Notably, Mastercard would not seek transaction approvals from the sponsor bank.  Instead, Mastercard would route the transaction to the program manager—in this case, CardEx—to approve or decline transactions.  7 Tr. 935, 1021.  At the end of the day, Mastercard then will aggregate all approved transactions and debit the sponsor bank for the aggregate settlement amount.  7 Tr. 937.  The sponsor bank, acting as "settlement agent," is ultimately responsible for making sure all parties are made whole, and would thus be liable to the payment processor for any shortfall in settlement funds.  3 Tr. 432 (Tordsen Testimony).

To agree to sponsorship, a sponsor bank would usually require a program manager like CardEx to provide the bank with funding for the prepaid cards, either as cards are issued or as funds are spent (and settlements come due).  The funding would then be placed into a bank-owned FBO account ("for benefit of the cardholder"), to satisfy the payment processor's daily settlements debit amounts.  1 Tr. 127–28.

There are two main types of funding arrangements between sponsor banks and program managers.  First, there is the "fully funded" program.  Under this arrangement, CardEx would ensure the sponsor bank has sufficient cash on hand to cover all *potential* "spends" on a card by remitting the full value that is placed onto a card at the time of issuance.  1 Tr. 46–47 (Randle Testimony).  Thus, if a client gives CardEx $100 to purchase one prepaid card with a value of $100, CardEx would be required, under a fully funded program, to wire the sponsor bank $100.

The second type of arrangement is a "partially funded" program.  Under this arrangement,

CardEx only needs to wire the sponsor banks sufficient funds to satisfy transactions *as they arise*. 1 Tr. 47. Thus, if a client gives CardEx $100 to purchase one prepaid card with a value of $100, but charges nothing on that card, CardEx is not required to give money to the sponsor bank. If the client then spends $10, CardEx would need to wire the sponsor bank $10 to cover that spend, and the remaining $90 stays with CardEx until it is spent by the cardholder.

Not all cardholders will spend 100% of the value that is loaded onto a prepaid card before the card expires. This residual value, or "breakage," is the primary revenue steam for prepaid card program managers like CardEx. 7 Tr. 938.[4] The contracts between CardEx and its sponsor banks (i.e., "sponsorship agreements") generally specify how and when breakage will be paid. Under a fully funded program—as was contemplated by the Sunrise Banks Sponsorship Agreement, discussed later—the sponsor bank will remit breakage back to CardEx after fully-funded cards expire with value. 7 Tr. 960; 1 Tr. 93. Similarly, CardEx cannot collect breakage from a partially funded program until the cards expire with value—the difference is that CardEx, having only funded actual spends, has presumably held on to the resulting residual value, negating the need for a remittance from the sponsor bank.

### 2. Alan Safahi Owned and Controls CardEx Despite Sean Safahi's Tenure as CEO

Sean Safahi, Alan Safahi's son, served as CardEx's Chief Operating Officer ("CEO") from early 2013 until October 25, 2013, when he resigned via an internal email to CardEx employees. Ex. 5 (Resignation Email). CardEx's filing with the California Secretary of State on September 30, 2013, identified Sean Safahi as CEO and Alan Safahi as CardEx's sole director. Ex. D. The question is whether Alan Safahi was so removed from CardEx during Sean Safahi's time as CEO as preclude culpability for the crimes alleged in the indictment.

---

[4] About 10% of CardEx's revenue came from administrative fees for making the physical cards and processing transactions. 7 Tr. 937–38. If a customer wanted to purchase a card worth $100, for example, a customer would pay CardEx a total $105: $100 would be earmarked for the card "load," and $5 would cover fees. 1 Tr. 115. The Target Group, one of CardEx's biggest clients, always paid fees via a check and separately wired card load amounts to CardEx. 4 Tr. at 589–90; Ex. 959 at 71, 197, 341.

United States District Court
Northern District of California

Trial testimony established that Alan Safahi was never far removed from CardEx's operations. Alan Safahi *himself* stated as much when interviewed by Special Agent Dmyterko via phone in 2015 (when the investigation into CardEx's activities began). According to Dmyterko's testimony, after being told federal agents were at Sean Safahi's residence, Alan Safahi explained to Agent Dmyterko over the phone "that he [Alan Safahi] was the person operating Card Express. He said his son was only – was 22 years old. He just gave him the title of CEO and was trying to give him some experience." 6 Tr. at 851. Alan Safahi's own conduct corroborates his admission to Agent Dmyterko. On June 29, 2013, Alan Safahi signed a Mutual Non-disclosure Agreement attached as Exhibit A to the KeyBank Termination Agreement (which will be described in the next section). Ex. 1018 at 11, 14. This signature, in which Safahi signed off as "Chairman," was executed while Sean Safahi was still CEO.

CardEx employees also testified as to Alan Safahi's ongoing control over CardEx's operating during Sean Safahi's time as CEO. Ron Wiggins, CardEx's Chief Operations Officer from December 2012 through June 2014, testified that he advised Alan Safahi on the Sunrise Banks Sponsorship Agreement, which Sean Safahi signed in June 2013: "A. … I reviewed the contract and provided some comments to Alan Safahi, as I recall. Q. Which contract is that? A. I believe that was the Sunrise contract." 7 Tr. 1019. Although Wiggins does not specify when he provided these comments to Alan Safahi, Wiggins also testified that in summer or fall 2013, Sean Safahi instructed him to implement "funding on demand" (described later) only with partially funded programs, but "Alan Safahi contacted [him] very soon thereafter…and explained to [him], or told [him] not to follow that instruction, and that Sean was doing that to cover himself, to shield himself from involvement in it." Alan Safahi thus retained a veto power over Sean Safahi's directives. 7 Tr. 970–74.

Sean Safahi's nominal role as CEO was further confirmed by CardEx's banking and business partners. Brian Tordsen, a Sunrise Banks Executive Vice President who would oversee the prepaid card sponsorship between Sunrise Banks and CardEx from July 2013 through 2014, testified he associated Alan Safahi as the person in charge of CardEx for most of his interactions with the company. 3 Tr. 392. Another Sunrise Banks employee, Stephanie Pfeifle, similarly testified that

5

Alan Safahi ran CardEx during 2013 and 2014.  1 Tr. 133–35.  Angela Montgomery, the owner of one of CardEx's biggest clients, The Target Group, testified she worked with Alan Safahi through 2012 and 2014 to implement a prepaid card program for her business.  4 Tr. 569–70, 579.

Finally, it was Alan Safahi who held exclusive control over CardEx's finances.  Agent Dmyterko testified: "Mr. Alan Safahi also told me over the phone [in 2015] that he's the one that controlled the bank accounts for Card Express."  6 Tr. 851.  Tom Cleveland, who worked as CardEx's accountant from June 2013 through September 2014, testified that in December 2013, after Alan Safahi had personally withdrawn $25,000 from CardEx's Union Bank account over a two week period, he told Alan Safahi: "his son was drawing much less, but when he took over, he was drawing more, and the company's funds would not support that level of withdrawals…."  4 Tr. 647.  Cleveland's testimony continued: "Q. …what did Alan Safahi say to you? A. He said, at the time, he needed the money; it was his company. And that was it."  4 Tr. 647.  Cleveland also testified that Alan Safahi controlled the authorization of wires from CardEx's operating account to its sponsor banks.  4 Tr. 718–19  (Although Cleveland seamed to later contradict himself by suggesting that Wiggins played a role in the authorizations: "Q. So Mr. Wiggins was the one who would tell you when to make those transfers or what to transfer? A. He would check the daily reports and then say: Okay. These are the amounts that need to go."  4 Tr. 704–05).

The Court finds Alan Safahi was not an absentee owner during Sean Safahi's tenure in 2013, but remained involved in critical operations, such as directing CardEx employees, signing contracts on behalf of CardEx, and controlling CardEx's finances.  Before proceeding to Subsection B, which details Alan Safahi's scheme to defraud Sunrise Banks, the following subsection describes the situation CardEx was facing as its relationship with Sunrise Banks began.

### 3. KeyBank Terminated its Sponsorship of CardEx Due to $2.25 Million in Liabilities

KeyBank agreed to sponsor CardEx's prepaid card program on August 3, 2009.  Ex. 1015.  "While many of the programs relating to Bankcard Products issued by KeyBank were 'fully funded' Card Programs, certain programs were 'partially funded' Card Programs."  Ex. 1018 at 1.  It was the partially funded programs that ultimately led KeyBank and CardEx to mutually agree to part

United States District Court
Northern District of California

ways via a Termination Agreement signed by Alan Safahi on October 14, 2013. Ex. 1018 at 1, 8–9.

According to testimony from Scott Randle—a KeyBank employee responsible for dealing with "high-risk" situations, who handled the CardEx wind down—the Termination Agreement arose from KeyBank's concerns over CardEx's solvency and its ability to "pay for that unfunded partial liability as cards were swiped." 1 Tr. 49. By October 14, 2013, the "total Partial Funding Liability [was] 2.25 [million]" across 78,000 prepaid cards. Ex. 1018 at 4. This meant that KeyBank faced up to $2.25 million in debits from the payment processor as cards were spent, but did not have an associated $2.25 million in its operating account to pay for these outstanding liabilities, because CardEx had only remitted to KeyBank actual spends per the partially funded arrangement. 1 Tr. 50. "If everyone would have transacted all those cards, all 78,000, in one day, then that would be the total amount due and payable to KeyBank to satisfy those transactions." 1 Tr. 51 (Randle Testimony).[5]

The Termination Agreement stated that CardEx had defaulted in two ways.[6] First, CardEx "failed to permanently reduce the Partial Funding Liability" in accordance with prior agreements. Ex. 1018 at 1. Second, CardEx "continued to load and reload value on to cards under partially funded Card Programs after the deadline by which CardEx was to have ceased such activity." *Id.*

Per the terms of the Termination Agreement, after 5:00 pm on October 14, 2013, CardEx was no longer "permitted to load or reload value on to any Bankcard Products," meaning CardEx could not open any new cards issued by KeyBank or add any new value onto existing KeyBank-issued cards. Ex. 1018 at 2; 1 Tr. 59. However, CardEx was required to "continue to process and service all Bankcard Product transactions and make daily settlements on Bankcard Products to KeyBank." Ex. 1018 at 2. This meant CardEx had to continue wiring money to KeyBank as

---

[5] Conversely, if all 78,000 prepaid cards expired without being used, the outstanding liability would not be realized. 1 Tr. 54. But this possibility was unlikely. *Id.*

[6] The Termination Agreement included the statement that "Neither CardEx nor any of its agents, employees, representatives have committed any fraudulent act relating in any way to any KeyBank Bankcard Products or Card Programs." Ex. 1018 at 4.

United States District Court
Northern District of California

cardholders spent the money on their cards, which could have been anywhere between $0 and the total outstanding liability of $2.25 million.  The wind-down would be complete when KeyBank was absolved of its partial funding exposure, which ultimately occurred in February 2014, when CardEx transferred the liability away from KeyBank to an unknown sponsor bank.  1 Tr. 71–72, 75.

Remarkably, KeyBank did not suffer any financial losses.  1 Tr. 105.  It was remarkable because, as of October 11, 2013—three days before the Termination Agreement went into effect— the bank account CardEx used to wire money to KeyBank had a total available balance of $42,719.  Ex. 499 at 6; 1 Tr. 55, 61–62.[7]

Alan Safahi was aware of the gap between CardEx's cash balance and its potential liability to KeyBank under the terms of the Termination Agreement.  Ron Wiggins testified that when he returned to CardEx in December 2012 to run the company's operations,[8] Alan Safahi tasked him with "finding an investor to infuse cash into the company and to find a solution to this negative balance scenario, to try to bring the company up to an even keel."  7 Tr. 945.  As Wiggins put it, CardEx needed additional cash "because the company had a fairly significant deficit in funding of [KeyBank] cards; and at some point in time, that would have to be corrected."  7 Tr. 946.  Wiggins was unable to secure outside financing.  7 Tr. 948.  But another plan soon materialized.

On June 21, 2013—four months before the KeyBank termination went into effect—CardEx had just finalized a separate Sponsorship Agreement with Sunrise Banks.  Unlike the sponsorship with KeyBank, Sunrise Banks did not allow for partial funding of its prepaid card programs.  This meant CardEx would not receive "breakage" until after cards expired and Sunrise Banks remitted funds back to CardEx—which could take anywhere from six months to one year. 1 Tr. 93.  Facing an imminent cash crunch with KeyBank in fall 2013, Wiggins was instructed "to come up with a solution…as to how to manage the company's cash position by underfunding accounts at [Sunrise Banks]."  7 Tr. 968–69 ("Q. And who instructed you to come up with this plan? A. Mr. Alan Safahi.

---

[7]KeyBank's Scott Randle did not have knowledge of whether CardEx had any other account in addition to the Wells Fargo to cover potential liabilities.  1 Tr. 116–17.  No evidence at trial established the existence of any such account.

[8] Wiggins' first stint as a CardEx employee was from 2006 to 2009.  7 Tr. 941.

Q. All right. Did you indeed execute this plan? A. Yes.").

### B. The Scheme: Defraud Sunrise Banks by Funding-on-Demand

This subsection will describe: (1) the mechanics of CardEx's client relationships, primarily The Target Group, (2) Alan Safahi's Sponsorship Agreement with Sunrise Banks and the Bank's understanding of what the Agreement entailed, and (3) the development of "funding on demand" under Alan Safahi's direction and supervision.

### 1. CardEx's Clients Pay in Full for Prepaid Cards

Ron Wiggins testified that during the time he worked at CardEx in 2006–2009 and 2012–2014, CardEx had always required its clients to pay CardEx the entire dollar-value of what they hoped to load onto a prepaid card (e.g., if a client wanted 100 prepaid cards each worth $10, the client must pay CardEx $1,000 plus administrative fees). 7 Tr. 934–35, 941.

The Target Group was a CardEx client from November 2009 through 2014. Ex. 53 at 31–42. Under the terms of the contract between The Target Group and CardEx, "all amounts required to fund and reload such cards [i.e., Deposit Funds] as are ordered" by The Target Group were to be paid "into a CardEx account via wire transfer…prior to [The Target Group's] receipt of the Cards." Ex. 53 at 34. The contract provided that all amounts required to fund and reload such cards "shall be used solely to fund and reload the cards and to pay CardEx fees up to the amount of the Deposit Funds made available via the CardEx Website." Ex. 53 at 34. The Target Group contracting officer at the time, Angela Montgomery, testified she understood the contract to mean that "any time" Target Group "sent a wire transfer for the load of the cards, it was solely to load the cards at a hundred percent value that we sent." 4 Tr. at 576–77. Montgomery also testified the Target Group paid administrative fees separately via check, not through wire transfers. 4 Tr. at 589–90, testifying to Ex. 959 at 71, 197, 341.[9] What happened with client funds after they were sent to CardEx was

---

[9] In contrast, one of CardEx's other clients, MillerCoors, paid CardEx funds and fees in the same wire. 2 Tr. 354; Ex. 987.

dictated by CardEx's agreements with its sponsor banks—the topic of the next section.

**2. The Sunrise Banks Sponsorship Agreement Authorized a Fully Funded Program**

CardEx entered into a "Prepaid Card Program and Processing Agreement" with Sunrise Banks on June 21, 2013.  Ex. 1017 at 2 (hereafter referred to as the "Agreement").  The Agreement was signed by Joan Herman of Sunrise Banks and Sean Safahi as CEO of CardEx.  Ex. 1017 at 28.  (Note that just eight days later, with Sean still serving as CEO, Alan Safahi signed CardEx into the KeyBank Termination Agreement in his capacity as CardEx Chairman).

Brian Tordsen—who joined Sunrise Banks and became Joan Herman's boss one month after Herman signed the Agreement—testified that the Agreement required CardEx to fully fund the cards by remitting all funds to Sunrise Banks, such that "when a customer goes to a store to swipe their card, the funds are in the bank to be allowed to be paid for that purchase."  3 Tr. 388–89, 392–93.  Ron Wiggins also testified that Sunrise Banks "required that the cards be fully funded," which meant that "the amount of funds that CardEx had collected from clients and had posted onto the CardEx platform would be on deposit at the sponsor bank."  7 Tr. 959.

The text of the Agreement is consistent with these expectations.  As a preliminary matter, the Agreement provides the following definitions: "'Load' means the loading of funds or value to a Card at the time such Card is activated, or subsequent thereto," and "'Load Amount' means the amount a Cardholder, employer or corporate sponsor Loads onto a Card." Ex. 1017 at 3.  According to Tordsen, loading has two separate and independent "aspects."  3 Tr. 454, 481.  The first aspect entails CardEx "loading the value onto the card" pursuant to a client's order, such that the value would be reflected in the client's account.  3 Tr. 454.  The second aspects entails CardEx sending the client's funds to Sunrise Banks to actually "load" the value, thereby making it available for settlement.  3 Tr. 454.

The Agreement's recitals section states that CardEx "desires to…remit to Bank such Load Amounts as [CardEx] receives from any third party clients and sellers."  Ex. 1017 at 2.  The Agreement's substantive provisions include: "All payments collected from Cardholders, employers or corporate program sponsors shall be collected by the Bank. To the extent [CardEx] receives such

10

sums, [CardEx] or [CardEx's] agent shall forward the same to the Bank immediately via wire, ACH transfer or as otherwise specified in the applicable Program Addendum."  Ex. 1017 at 5 (Section 2.6: Card Value Loads and Delivery of Cardholder Payments).[10]

Although the Agreement contemplated that "all payments…shall be collected" by Sunrise Banks itself, Tordsen testified that the Agreement permitted CardEx to collect payments directly from clients, and CardEx did so here.  3 Tr. 395.  Tordsen opined that Sunrise Banks includes such a provision in its sponsorship agreements because customers might be "more comfortable sending [payments] to the program manager – in this case, Card Express – because that's who had the relationship."  3 Tr. 455.  But this was not CardEx's money to spend.  Instead, the Agreement provided:

> For all Programs (other than gift card Programs) [CardEx] shall be responsible for the collection and transfer of Load Amounts to the Bank, all as further described on the applicable Program Addendum. It is expressly understood that any Load Amounts coming into the possession of [CardEx]…shall be deemed to be held in trust for the Bank (i.e., statutory trust) and for the benefit of the applicable Cardholder, and no part of such Load Amount shall be deemed the property of, or an asset of, [CardEx].

Ex. 1017 at 8 (Section 3.11: Transfer of Load Amounts and Payments).  Based on the terms of the Agreement, CardEx was required to either (1) "immediately" transfer to Sunrise Banks "any" funds or value that its clients loaded onto cards at the time of (or subsequent to) a card's activation, or (2) hold such funds or value in statutory trust for the bank.  The Agreement makes no allowance for CardEx withholding, or spending, any portion of client funds.

Further indication that the Agreement contemplated a fully-funded model is found in Section 3.8, captioned Establishment of Funding Account:

> As Bank may direct, [CardEx] shall establish and maintain a Funding Account at Bank for purposes of receiving funds from Card issuance and Cardholder Loads from sales or Loads attributable to [CardEx] marketing performed directly or through any agent of [CardEx]. [CardEx] shall ensure at all times *adequate funds are available to fund all Loads* to the Cardholder Accounts.

---

[10] The Agreement does not contain such a Program Addendum setting forth additional payment methods.  3 Tr. 457.  Tordsen testified that program addendums "were typically done after the program launched to finalize the details of the program."  3 Tr. 457.

United States District Court
Northern District of California

Ex. 1017 at 7 (emphasis added).  This provision is inconsistent with CardEx providing Sunrise Banks with anything less than the full amount of money equal to the "funds or value" clients loaded onto their prepaid cards.  *See also* 3 Tr. 391–92 (Tordsen Testimony) ("Q. Did this contract contemplate in any way a partially funded prepaid card program? A. It did not. Q. Okay. So what type of prepaid card program does this contract contemplate? A. It's what we considered a good funds model, where the cards weren't loaded until the funds were in the bank to be spent."); 1 Tr. 128–29 (Pfeifle Testimony) (testifying that Sunrise Banks had to be "fully funded due to our regulations.").

The Agreement itself is opaque as to whether CardEx needed to send Sunrise Bank daily reports disclosing card balances and daily loads.  For example, Exhibit D to the Agreement provides that "standard reports and the Bank flat files will be made available each day by 9 a.m. Central Time," and that "[c]ustom reports may be included in this Service Level upon mutual agreement after six months of production experience."  Ex. 1017 at 35.  Section 3.18 of the Agreement details various kinds of records and reports CardEx was required to keep or produce upon request, but does not mention reports pertaining to daily loads.  Ex. 1017 at 10-11 (Section 3.18: Recordkeeping; Reporting; and Audit Rights).  However, Wiggins testified that after the consummation of the Agreement, Sunrise Banks provided "specifications for reports."  7 Tr. 1026.

Testimony from Sunrise Banks witnesses indicates that, despite the absence of such provisions in the Agreement, there was an expectation that CardEx provide Sunrise Banks with reports of total card balances and loads.  Brian Tordsen testified daily reporting of total card balances was standard in the prepaid card industry, and CardEx was required to submit daily reports to Sunrise Banks for "account balances and transactions," i.e., the dynamic balances of individual cards.  3 Tr. 404-05, 482, 486.  In Stephanie Pfeifle's testimony, discussed later, is an implicit understanding that CardEx would report card balance summaries to enable Sunrise Banks to reconcile its books.  1 Tr. 135.[11]

---

[11] On cross examination, however, Pfeifle conceded she was not involved in the negotiation of the contract between Sunrise and CardEx, nor could she recall ever seeing the contract. 1 Tr. 208–209

United States District Court
Northern District of California

United States District Court
Northern District of California

### 3. Safahi Directed the Creation of Funding on Demand

Despite the Sunrise Banks Agreement stating that CardEx would fully fund Sunrise Banks cards, Alan Safahi devised a scheme to withhold client money by misleading Sunrise Banks as to how much money CardEx was receiving from clients for card loads.  7 Tr. 984 (Wiggins testifying that Safahi's plan was put in place to "decrease the amount of funds that CardEx would be required to transfer to the bank that day…provid[ing] CardEx with cash for operations.").

Rather than reporting to Sunrise Banks the total amount of money clients loaded onto cards—which would require CardEx to wire to Sunrise Banks an amount of money equal to the total loads—Safahi directed Wiggins to create a system that would report to Sunrise Banks only the *daily spends* on cards rounded up to the nearest dollar, while falsely representing that such reports reflected daily total loads.  7 Tr. 965-69.

At Safahi's direction, Wiggins, with the help of CardEx software developer-consultant Mony Nhong, created funding on demand, or FOD—a system to report to Sunrise Banks, not the actual total card balances, but only spends plus a small round-up.  7 Tr. 967-69 (Wiggins Testimony); Ex. A at 1272 (Nhong consulting invoice for June 2013 detailing early-stage work on FOD); 2 Tr. 322 (Nhong testifying he built FOD pursuant to the migration plan specifications).

The architecture of FOD can be found in an email sent by Wiggins on July 31, 2013 to Sean Safahi, Kelly Keller-Heikkila,[12] Mony Nhong, and Tom Knox. Ex. 4 at 1-5. (Alan Safahi was not included as a recipient).  The subject of Wiggin's email was "sponsor bank migration process" and included an attachment titled "KB to Sunrise migration 7-30-13" written by Wiggins with input from Nhong. Ex. 4 at 1-5; 7 Tr. 961, 1031.  The migration plan included specs for a new reporting system, FOD, which would be used exclusively in the Sunrise Banks sponsorship.  2 Tr. 300, 347.

Nhong testified that under the new reporting system, client cardholders would see "the same balance as they usually see in their system" (i.e., the total available card balance), but Sunrise Banks would be presented with a "separate view" that reported total card balances as a function of spends.

---

[12] During the 2013–2014 time period, Kelly Keller-Heikkila went by the name Brian Keller-Heikkila.

2 Tr. 298, 300, 302.  Kelly Keller-Heikkila, a CardEx IT consultant from 2012 to 2014 who also worked with Nhong on implementing FOD, testified that FOD changed an otherwise symmetrical reporting system: "the cardholders would see the balances as they expect them to; and then on the back end [accessed by Sunrise Banks] ... [the cards] were being funded on demand when transactions occurred."  4 Tr. 738, 728.

The migration plan was meticulous, providing a series of "rules" to make differential reporting possible.  The plan starts with designating Sunrise Bank cards as the *only* cards subject to the FOD rules: "If the DDA [Designated Depository Account] is a Sunrise DDA ... perform the load using the FOD logic."  Ex. 4 at 2.  A section titled "Funds Transfer and FOD" then sets forth the step-by-step process for how to handle incoming client loads for Sunrise Banks cards:

- Funds loaded directly to a Sunrise DDA will follow the FOD rules as indicated below...:

    - The load will credit the DDA FOD "reserve balance."

    - The load to the reserve balance will not be reported in the Sunrise flat file or other sponsor bank load and cardholder balance reports.

    - The load will credit the ledger balance and available balance as reported in eCap[13] and www.mycardex.com.

    - ...[O]nce each day there will be a load from the FOD reserve balance to the ledger balance equal to the approved transactions during the current processing cycle plus the FOD round-up amount defined by the program parameters. This load will be reported in the flat file and sponsor bank reports but will not impact the ledger and available balances reported in eCap and mycardex.com.

Ex. 4 at 4.  "What this is essentially saying," according to Wiggins's testimony, "is that we would maintain two balances for each card...[t]he reserve balance, which is the actual card balance which is not reported to the bank...[a]nd then the... 'ledger balance,'... which would be reported to the

---

[13] eCAP was an internal front-end software, analogous to a back office, "designed for internal use only," such as CardEx customer service representatives needing to review cardholder transactions and resolve issues.  2 Tr. 328, 331.  A "bank user" could also have access to eCAP, but it is not clear whether anyone at KeyBank or Sunrise Banks accessed eCAP.  2 Tr. 330-32.

[bank] – which would be the lesser amount." 7 Tr. 965 (Wiggins Testimony).

Under the FOD rules of this plan, the balance of the cards reported to Sunrise Bank would be computed "as a function…of the spend, plus a roundup." 7 Tr. 966. This meant that if there was no spend on a card, then CardEx would reports to Sunrise Banks a zero balance on that card regardless of what value CardEx had actually loaded onto a card pursuant to a client's order. 7 Tr. 967. If there was a spend for $20, Sunrise Banks would be told the balance was $20. 7 Tr. 967. If there was a spend for $19.50, Sunrise Banks would still be told the balance is $20 according to the "FOD round-up amount" rule. 7 Tr. 967. Wiggins could not recall who came up with the idea for the round-up, but he testified "the roundup was necessary because it would look very unusual if you didn't have an even number. In other words, someone would not deposit $47.13 to a card. So for it to appear credible, it was rounded up to 50." 7 Tr. 986.

Nhong testified he did not "believe that [FOD] was supposed to defraud the bank or any customer," and would not have developed FOD had he believed that was its purpose. 2 Tr. 342. Jonathan Germain, who worked for CardEx from 2004 to 2014 as a client relations manager, testified he began noticing changes to eCAP in summer and fall of 2013. 3 Tr. 488–492. eCAP was an internal front-end software, analogous to a "back office" where CardEx client relations managers could review, among other things, cardholder accounts and transactions. 3 Tr. 491. Germain testified to a conversation he had with CardEx developers after noticing changes on eCAP: "They basically said that the less I know, the better." 3 Tr. at 496.

Although Alan Safahi was omitted as a recipient from the July 31, 2013 email that included the FOD plan, the evidence indicates Safahi was both aware of and directed the implementation of the FOD plan for Sunrise Banks. Like Wiggins, Mony Nhong testified it was Alan Safahi who initially approached him with the FOD project and further directed him to work with Wiggins on the project's development. 2 Tr. 295, 348. Wiggins further testified during FOD's development, he received an email from then-CEO Sean Safahi, instructing him *not to utilize* the FOD rules unless the sponsor bank allowed for partially funded cards. 7 Tr. 970-971. But Sean Safahi's instructions were not followed. Wiggins testified: "Alan Safahi contacted me very soon thereafter…and explained to me, or told me not to follow that instruction, and that Sean was doing that to cover

United States District Court
Northern District of California

himself, to shield himself from involvement in it."  7 Tr. 972.

Sean Safahi formally resigned on October 25, 2013.  One week later, Alan Safahi was included as a recipient on a November 2, 2013 email captioned "FOD requirements."  Ex. 6 at 1. In the incoming message, Nhong offered a proof of concept for implementing FOD: "…I now believe that the best way is to clone eCAP and make it a read only version of eCAP for the bank users…This way we can have two set of system [*sic*] running side by side where the current eCAP will continue to work the way it is now for CSR [customer service reps] and the new clone will be for external users, such as KeyBank."  Ex. 6 at 1.  (The "external user" ended up being Sunrise Banks. 5 Tr. at 751).  Alan Safahi responded to Nhong's proof of concept: "Sounds good. Please work with Ron on this and come up with a new name to avoid confusion… ."  Ex. 6 at 1.  And on November 9, 2013, Alan Safahi sent an email to CardEx employees, including Nhong, urging the creation of a testing environment "ASAP" to resolve bugs in CardEx's system including the "FOD issue."  Ex. 7 at 1.

### C. The Execution: Underpay Sunrise Banks By Reporting Spends as Loads

This subsection will detail (1) CardEx's load reporting to Sunrise Banks, (2) the variance between what CardEx received from clients and what it transferred to Sunrise Banks to satisfy daily loads, (3) Sunrise Bank's efforts to make sense of CardEx's reports, (5) CardEx's revelation of $2.7 million in previously undisclosed loads, and (4) Safahi's cash withdrawals as CardEx collapsed.

### 1. CardEx's "Load Reports" Followed the FOD Rules

Ron Wiggins delivered near-daily reports on behalf of CardEx to Sunrise Banks after the commencement of the sponsorship in fall 2013.  The primary report was a "Card Balance Summary Report" which generally included three constituent reports: (1) a Fee Report, which listed all transaction fees for that day, (2) a Posted Transactions Report, which listed card purchases made on that the that day and a few days prior, and (3) a "Load Report," which listed "Funds Earned" on individual cards and *purported* to represent value loaded onto new or existing cards during that reporting period.

The Load Reports, however, were simply the output from the FOD system.  Cleveland

testified that Funds Earned meant "whatever they're claiming the system generated as funds to be deposited to those account numbers." 4 Tr. at 674. Wiggins expressed a similar sentiment: "Q. So this is reporting spend? A. Yes. Q. Not loads? A. It's the roundup – the spend with the roundup." 7 Tr. 982. As seen in the Load Report sample below, Funds Earned was always a round number, consistent with the FOD round-up rule:

| FUNDING | | | | | | |
|---|---|---|---|---|---|---|
| FUNDING | Funds Earned (DO N | 1061640734 | 549736XXXXX1805 | $15.00 | 6/9/2014 | 6/9/2014 |
| FUNDING | Funds Earned (DO N | 1061645957 | 549736XXXXX1083 | $50.00 | 6/9/2014 | 6/9/2014 |
| FUNDING | Funds Earned (DO N | 1061645993 | 549736XXXXX1448 | $10.00 | 6/9/2014 | 6/9/2014 |
| FUNDING | Funds Earned (DO N | 1061646021 | 549736XXXXX1729 | $5.00 | 6/9/2014 | 6/9/2014 |
| FUNDING | Funds Earned (DO N | 1061646366 | 549736XXXXX5175 | $50.00 | 6/9/2014 | 6/9/2014 |
| FUNDING | Funds Earned (DO N | 1061646367 | 549736XXXXX5183 | $50.00 | 6/9/2014 | 6/9/2014 |
| FUNDING | Funds Earned (DO N | 1061649228 | 549736XXXXX9912 | $15.00 | 6/9/2014 | 6/9/2014 |
| FUNDING | Funds Earned (DO N | 1061649234 | 549736XXXXX9979 | $10.00 | 6/9/2014 | 6/9/2014 |
| FUNDING | Funds Earned (DO N | 1061653170 | 549736XXXXX4193 | $50.00 | 6/9/2014 | 6/9/2014 |
| FUNDING | Funds Earned (DO N | 1061653696 | 549736XXXXX8293 | $10.00 | 6/9/2014 | 6/9/2014 |
| FUNDING | Funds Earned (DO N | 1061654121 | 549736XXXXX8764 | $20.00 | 6/9/2014 | 6/9/2014 |
| FUNDING | Funds Earned (DO N | 1061654173 | 549736XXXXX9283 | $5.00 | 6/9/2014 | 6/9/2014 |
| FUNDING | Funds Earned (DO N | 1061654208 | 549736XXXXX9630 | $25.00 | 6/9/2014 | 6/9/2014 |
| FUNDING | Funds Earned (DO N | 1061654214 | 549736XXXXX9697 | $10.00 | 6/9/2014 | 6/9/2014 |
| FUNDING | Funds Earned (DO N | 1061654222 | 549736XXXXX9770 | $35.00 | 6/9/2014 | 6/9/2014 |
| | | | | $360.00 | Number of Trans: 15 | |
| | | | *Bin Code Total:* | *$360.00* | *15* | |
| | | | MasterCard Total: | $60,889.31 | 853 | |
| | | | FIID: 9043 Total: | $60,889.31 | 853 | |
| | | | Grand Total: | $60,889.31 | 853 | |

Ex. 285 at 39. The Grand Total listed in the Load Report dictated how much money CardEx would wire to Sunrise Banks on that day to cover the new "loads." 4 Tr. at 677.[14] So for the June 9, 2014 Load Report sampled above, CardEx told Sunrise banks it would wire over $60,889.31 to cover "today's loads." Ex. 291 at 1. But the reported loads were not loads – they were spends, rounded up. The actual loads--the fund amounts CardEx *actually received* from its clients for prepaid cards—were never listed in this report.

## 2. CardEx's Client Revenue Consistently Exceeded Payments to Sunrise Banks

As of October 14, 2013, CardEx was barred from issuing new KeyBank cards or reloading existing KeyBank cards, but still had to pay KeyBank for spends on the outstanding $2.25 million in card balances. The day after the KeyBank termination went into effect, on October 15, 2013, CardEx received a wire for $119,000 from The Target Group. Ex. 499 at 2. This bumped CardEx's

---

[14] There were some exceptions. On July 15, 2014 CardEx reported $32,766.52 in total loads but only wired Sunrise Banks $17,000, and on July 16, 2014 CardEx reported $30,202 in loads but wired Sunrise Banks nothing. Ex. 403 at 1055; 4 Tr. at 684.

United States District Court
Northern District of California

1    cash balance in its Wells Fargo account from $42,719.55 on October 11 up to $138,586.99 on

2    October 15. Ex. 499 at 6.  The Target Group wired CardEx another $244,400 on October 21, 2013.

3    *Id*. at 2.

4         The Target Group's funding, totaling $363,400, was "solely to load the cards at a hundred

5    percent value that [Target] sent."  4 Tr. at 576–77.  Because CardEx was barred from issuing new

6    KeyBank cards or reloading value onto existing KeyBank cards, it could fulfil The Target Group's

7    October order of $363,400[15] only by turning to its new sponsor—Sunrise Banks.  But CardEx's

8    Wells Fargo statement does not show *any* outgoing wires to Sunrise Banks in October 2013.  What

9    the statements do show is that, after October 15, 2013, CardEx wired KeyBank a total of $395,000

10   over several days, leaving only $1,869.91 in the CardEx account on October 25, 2013.  Ex. 499 at

11   4–5, 6; Ex. 1099 at 2–3.

12        This was one instance of a pattern that persisted over the following twelve months. In

13   November 2013, The Target Group wired a total of approximately $560,000 into CardEx's Union

14   Bank[16] account, but CardEx wired Sunrise Banks only $265,000 that month.  Ex. 925.  November

15   18, 2013 was a particularly important date.  On that day, The Target Group wired CardEx $149,300.

16   *Id*.  CardEx then wired $35,000 to Sunrise Banks and $35,000 to KeyBank.  *Id*.  The Sunrise Banks

17   Load Report for November 18, 2013 stated a Grand Total of $5,695 in "Funds Earned" across all

18   Sunrise Banks issued cards. Ex. 395 at 28.  The Load Report for November 19, 2013, the next day,

19   reported only $10,435 in loads for that day.  Ex. 395 at 74.

20        Wiggins testified that the November 18, 2013 and November 19, 2013 Sunrise Banks Load

21   Reports were not accurate depictions of actual loads, but instead reported spends with a round-up

22   for the preceding day.  7 Tr. 981–982, 985; Ex. 402 at 24; Ex. 395 at 69–74.  Cleveland testified

23   from October 2013 onwards, none of the reports sent to Sunrise Banks reflected the actual loads on

24   cards: "The reports were fiction. They didn't – they didn't report the actual numbers."  4 Tr. at 657.

25   _____

26        [15] The defense sought to undermine this inference by impeaching Cleveland: "Q. When
     money came in from a customer, you wouldn't know whether or not that money was for a card they
27   already had or the money was supposed to be for cards they were getting in the future? A. I would
     not know that. I would only know what was on the invoice." 4 Tr. 714.

28        [16] CardEx moved its banking from Wells Fargo to Union Bank in November 2013.

United States District Court
Northern District of California

According to Cleveland, "they literally understated – the deposits that went to Sunrise Bank – should have gone to Sunrise Bank, 2.4 million of them, dollars, were used to pay off KeyBank. That was the outstanding underfunding from KeyBank. So in order to convert over to Sunrise Bank, they generated these reports that would delay funding." 4 Tr. at 658.

The discrepancies between CardEx's client revenue and its payments to Sunrise Banks continued into the following year. In March 2014, Cleveland took over from Ron Wiggins in sending daily reports to Sunrise Banks, but also retained his accounting responsibilities and had access to CardEx's Union Bank account. 4 Tr. 648, 654–55. Cleveland testified that, after he took over, he observed that "the generated funding reports did not agree with the deposits that were coming in. Some days, they'd be over. Some days, they'd be under. Some days, they'd be severely under. But they weren't – the funding reports did not tie back to the direct deposits to the Union Bank account in any way, shape, or form." 4 Tr. 660. Cleveland also testified he warned Safahi that "it was going to come out that there was a shortage in funding and it was going to have to be dealt with," and Safahi responded "he would deal with it; it was his problem." 4 Tr. 662.

Analysis of CardEx's Union Bank statements and the Load Reports from March 2014 onwards confirms Cleveland's suspicion that Sunrise Banks was being underfunded. On March 24, 2014, four clients wired CardEx a total of approximately $129,000. Ex. 929 at 3.[17] The Sunrise Banks Bank Load Report for March 24, 2014 stated a Grand Total of $19,732.94, which purported to be "the total amount of loads that day." Ex. 327 at 30; 4 Tr. 654 (Cleveland Testimony). In the email attaching the Load Report, Cleveland wrote to Pfeifle: "FYI: Today's wire transfer will be $19,732.94." Ex. 327 at 1. Then on April 28, 2014, CardEx received a wire for $120,300 from The Target Group (among other wires). Ex. 930 at 2. The Sunrise Banks Load Report for April 28, 2014 stated a Grand Total of $38,101.43. Ex. 309 at 14. Cleveland emailed Pfeifle the next day, informing her that the wire for the day's prior loads "will be $38,101.43." Ex. 309 at 1.

On June 9, 2014, The Target Group wired CardEx $146,000. Ex. 932 at 1. The Sunrise

---

[17] National Gift Card Corp. wired $11,030, Minka Lighting wired $14,234.88, The Target Group wired $101,300, and MillerCoors wired $2,564. Ex. 929 at 3.

Banks Load Report for June 9, 2014 stated a Grand Total of $60,889.31. Ex. 285 at 39. The next day, Cleveland emailed Pfeifle, cc'ing Safahi, informing her that CardEx would wire over $60,889.31 to cover "today's loads." Ex. 291 at 1. Then on July 7, 2014, CardEx received $138,799 from The Target Group and $7,354.60 from MillerCoors. Ex. 933 at 1. The Sunrise Banks Load Report for July 7, 2014 stated a Grand Total of $27,163.07. Ex. 268 at 113. Cleveland emailed Pfeifle stating the "wire today was $27,000." Ex. 268 at 1. And on August 4, 2014, CardEx received $120,070.78 from The Target Group and $4,058.60 from MillerCoors. Ex. 934 at 1. The following day Cleveland wrote Pfeifle: "Wire amount was $27,270.59" for prior day's loads. Ex. 244 at 1.

Had Safahi's FOD scheme worked perfectly, Sunrise Banks might have never suspected that something was amiss. But as detailed in the following section, Sunrise Banks started noticing irregularities in CardEx's reporting early on, and even suspected underfunding starting in May 2014. Despite Sunrise Bank's efforts to understand the situation and seek clarity from CardEx, Alan Safahi failed to disclose what was going on behind the scenes. It was not until September 25, 2014 when Alan Safahi directed his CardEx employees to reveal to Sunrise Banks the full scale of underfunding: $2.77 million in previously unreported loads.

### 3. Sunrise Banks' Efforts to Resolve the Puzzling Reports Were Unsuccessful

Sunrise Banks relied on two types of reports tendered by CardEx to reconcile its books: Card Balance Summary Reports, detailed above, and "flat files." 1 Tr. 135. To Sunrise Banks, these reports were essential to ensuring that "all of the activity is accounted for as well as all of the funding that should be available is available; also moving it into the correct accounts in order for it to be divvied out to the networks or the fees." 1 Tr. 132 (Pfeifle Testimony). As understood by Stephanie Pfeifle, the Sunrise Banks employee tasked with reconciling the CardEx program, the Card Balance Summary Reports from CardEx were supposed to "represent all of the actual balances that were available for cardholders to spend," which implies an accurate accounting of total loads. 1 Tr. 138 (Pfeifle Testimony). The flat files, as described by Pfeifle, were "a data dump of the transactions that happened the day before" on each individual card (i.e., spends) and "should" have also included card balances. 1 Tr. 210.

At the earliest stages of the sponsorship, Pfeifle had to consistently remind CardEx that its reports were either late or missing.  See Ex. 39 at 3-4 (emails from Pfeifle to Wiggins) ("I am missing the reports for 11/16/2013") ("Also missing yesterday's reports (12/17/2013)") ("I am also missing single reports for 10/28 fee report and 10/29 load report as well as the 11/16 report.").  Over time, Pfeifle also began noticing a "trend" in the reports "where the amount that was being spent was almost the exact same amount [CardEx] w[as] loading on a daily basis," 1 Tr. 139, such that if CardEx reported "30,000 [total] in spend, we got about 30,000 in [total] loads."  1 Tr. 213. According to Pfeifle, this made her suspicious because "nobody gets a card and spends it all in the same day." 1 Tr. 139.  Most concerning to Pfeifle was her inability to reconcile the Card Balance Summary Reports with the card-level data in the flat files: if the overall balance reported a $50,000 difference from the day prior, "we should have $50,000 in the activity – in the flat file, and we did not." 1 Tr. 136–37, 223.

On December 18, 2013, Pfeifle wrote Wiggins an email pointing out ongoing discrepancies in the reporting:

> I am 27,694.76 off on reconciling your activity with your card balance so detail is still missing. … I noticed that there is more spend on cards than loads between oct and early nov. … By 11/5 there is an additional (1356.55) in spend but only 160.00 in loads. How is spend more than loads? What is missing in the reports?

Ex. 39 at 4.  Wiggins responded, cc'ing Alan Safahi: "I suspect that there are missing loads from the early testing in Oct. These loads were done manually and may not be included in the reports." Ex. 39 at 3.  Wiggins then followed up before Pfeifle could respond, again cc'ing Alan Safahi: "What is the 27,694.76 discrepancy? Which accounts?"  *Id.*  In response, Pfeifle stated there was a difference of $27,694 between the overall card balances and the activity reflected in the flat file for December 18.  Ex. 39-3; 1 Tr. 144–145, 235.  Pfeifle followed up again that afternoon, telling Wiggins and Safahi: "The overall card balance is a huge issue. This is a must have on our end."  Ex. 39 at 1.

On January 9, 2014, an internal Sunrise Banks email identified various "issues" Sunrise Banks was having with CardEx, including: "Cards being loaded without funding in place" and "Have not been receiving accurate files on a daily basis." Ex. 403 at 1815.  Sunrise Banks continued

to express its concerns regarding the accuracy of CardEx's reporting into early 2014 via emails to Alan Safahi and other CardEx employees. Exs. 7, 15, 16, 18, 19. In February 2016, Sunrise Banks's compliance department conducted a routine review of the CardEx prepaid card program and concluded: "Since the time of launch, in late October, Card Express has not been able to send files to the bank which captures the fee transactions or any adjustment transactions." Ex. 1010 at 5, 6.

The ongoing problems led Pfeifle to conduct an in-person site visit to CardEx's facilities in southern California in spring 2014. 1 Tr. 150. Pfeifle testified that during her visit, she made a presentation to Safahi on "how we create our reconcilement, what we're using his data for, how we're trying to match it back, all of the issues that we're having." 1 Tr. 153. Pfeifle testified that Safahi reassured her he would get the issues solved as soon as he could. *Id*. ("Q. Okay. Was there any promise of any particular things or explanations given to you about what might have caused that? A. Not really, no. It was just: We'll get it fixed."). The problems persisted. On March 27, 2014, Safahi emailed Pfeifle attributing a delay in sending flat files to a technical decryption issue in CardEx's system software. Ex. 40; 1 Tr. 158–59.

Matters escalated on April 21, 2014, when Joan Herman, the Sunrise Banks Senior Vice President who signed the Sponsorship Agreement, wrote Alan Safahi to tell him CardEx was in breach of the Sponsorship Agreement and that termination was imminent if the reporting issues were not resolved. Exs. 22, 41. Upon giving notice of default, Sunrise Banks gave Safahi "30 days to resolve the issues" identified in the notice. 3 Tr. 410 (Tordsen Testimony).[18]

On May 21, 2014 Joan Herman emailed Alan Safahi requesting updates on various items they had discussed after her notice of breach, including the status of getting a new bank sponsor to take over the program. Ex. 9 at 1–2. In that email, Herman also wrote: "We believe you are underfunded however we cannot prove this out without reporting which we have not received." Ex. 9 at 2. (Alan Safahi's response to Herman on May 21, 2024 did not fulfil Herman's request for updates or even address her belief that CardEx was underfunding its cards. Ex. 9 at 1.)

---

[18] Sunrise Banks did not shut down the card program after the initial 30-day period lapsed because CardEx indicated it had found another sponsor bank to take over. 3 Tr. 410. Sunrise Banks thus extended the cure period to allow for a transition. *Id*. But another bank did not materialize.

United States District Court
Northern District of California

Pfeifle echoed Herman's suspicions of underfunded cards in an email sent to Safahi one week later. Pfeifle wrote: "My guess is your activity account is still riding the edge of being underfunded as spend continues without the benefit of timely funding on the part of Card Express." Ex. 43 at 3 (sent May 28, 2014); 1 Tr. 163–164. Safahi disagreed with Pfeifle's guess, and wrote back the following day: "We actually think we are overfunded but will know for sure once we validate a couple of other items." Ex. 42 at 2.

Sunrise Banks' Heather Schumacher responded first: "Hi Alan, We are most certainly not overfunded.  The pooled CH account is about 2 days from being overdrawn based on the settlement that FIS is taking from us. The bank cannot 'float' you this money. You cannot load money on to cards without the bank having money in the funding account."  Ex. 42 at 1.  Herman responded similarly to Safahi: "This is of the utmost urgency that you fund your cards BEFORE they are sent out to cardholders and/or used. I am not sure why this continue to happen since all of your cards are corporate funded there should no issues at all in getting those funds to the bank BEFORE the cards are in the hands of the cardholder or in the case of reloads before the cardholder attempts to use the card.  This lack of funding must cease immediately." Ex. 42 at 1.

On August 5, 2014, Herman informed Alan Safahi penalties would be assessed against CardEx pursuant to the terms of sponsorship agreement, but that CardEx could avoid the penalties by either (1) getting Sunrise Banks "the files and reporting daily and on time," or (2) "get[ting] the business moved quickly to your new bank." Ex. 45 at 1.  Safahi responded: "This is unacceptable. We cannot afford to pay any penalties and do not believe they are owed just because we are off by a few dollars each day that gets resolved the following day (all due to timing issue not any system problems with CardEx or FIS as you seem to continuously imply)."  *Id.*

Soon after, CardEx and Sunrise Banks began discussing a potential "wind-down" of the prepaid card program.  Ex. 403 at 343 (August 20, 2014 letter from Tordsen to Safahi).  It was not a smooth process. On August 25, 2014, Tordsen, in response to Safahi's suggestion that CardEx would self-deduct fees from the wires sent to Sunrise Banks for loads, quoted verbatim Section 2.6 and 3.11 of the Sponsorship Agreement pertaining to CardEx's obligations to transfer *all* payments received from clients to Sunrise Banks or hold them in trust.  Ex. 48 at 1.  Joan Herman expressed

a similar sentiment to Tom Cleveland one hour later, stating: "Please ensure the full amount of all loads is wired to the bank on a daily basis prior to loading cards as per the contract."  Ex. 49 at 1.

**4. The $2.7 Million Load Report Revealed the True Scale of Underfunding**

Things came crashing down in late September.  On September 25, 2014, Jonathan Germain sent Sunrise Banks a package of daily reports[19] for September 19, 20, 21, 22, and 23.  Ex. 196 at 1. The September 21, 2014 reports reflected a total balance across all cards of $93,734.75 with $19,342.99 in new loads. Ex. 196 at 65, 78.

The Load Report for the following day, September 22, 2014, stated a Grand Total of $2,735,531.27 in Funds Earned, with a new total balance of $2,774,953.61 across all prepaid cards. Ex. 196 at 482, 485.  Tordsen testified that, had CardEx had *actually* loaded $2,735,531.27 onto the cards, then Sunrise Banks "should have received a wire for that exact same amount," but it did not. 3 Tr. 428.  And while The Target Group did wire CardEx $93,400 on September 22, 2014, Ex. 935 at 2; Ex. 961 at 66, CardEx did not received anywhere close to $2.7 million from clients on that day. 3 Tr. at 522 (Germain Testimony).  This meant Sunrise Banks, as settlement agent, was potentially on the hook for $2.7 million in spends—but the bank did not have those funds.  3 Tr. 429, 432.

Pfeifle responded first: "Is the Load report for 9/22 correct? Did you really load 2,735,531.27?????"  Ex. 44 at 1 (addressed to Safahi, Germain, and Cleveland); 1 Tr. 204.  Sunrise Banks then instituted an emergency shutdown of all cards, which took effect within 48 to 72 hours after receiving September 21, 2014 Load Report. 3 Tr. 449.

The $2.77 million represented the true scale of CardEx's underfunding between October 2013 and September 2014.  Cleveland testified: "From October, the start of Sunrise, through when it cutoff, there were basically $11.9 million of deposits that came in that should have been gone --

---

[19] Germain inherited CardEx's reporting responsibility from Tom Cleveland on September 12, 2014. Ex. 205 at 1 (email from Cleveland to Pfeifle and Safahi: "Beginning next week, the daily reconciling, sending of reports, and sending this e-mail will transfer to Jonathan Germain, our Operations Manager." When Germain took over, the reports were still generated using the FOD system. 7 Tr. 1007 (Wiggins Testimony).

United States District Court
Northern District of California

should have gone to Sunrise. Only about 9 million did." 4 Tr. 698. Wiggins similarly testified: "Based on the accounting reports that I was producing monthly with full balance sheets and all the items from the general ledger, my estimate of the outstanding balances and the liability to Sunrise Bank was on the order of $2.7 million." 4 Tr. 692–93. Wiggins testified the September 22, 2014 Load Report was the *only* accurate load report CardEx ever sent to Sunrise Banks. 7 Tr. 990–91.

The September 22, 2014 Load Report was not a fluke or accidental leak. Germain testified that the night before he sent the email package containing the September 22, 2014 Load Report, he spoke with Alan Safahi: "he said that … we can't continue on; we're going to have to, you know, shut it down; and that we need to, you know, send the – this report to Sunrise and that'll be the end of it." 3 Tr. at 518. Cleveland also testified that it was Alan Safahi's idea to send the September 22, 2014 Load Report. 4. Tr. at 698 ("Q. It was Alan Safahi who decided to send that report; right? A. All I know is he did whatever he had to tell the programmers or whoever to create that report. Q. But that was at Alan Safahi's direction? A. That's right.").

### 5. Alan Safahi Withdrew Cash as CardEx Collapsed

On September 24, 2014, the day before Germain reported the $2.7 underfunding, Alan Safahi informed all CardEx employees that CardEx was shutting down, effective September 30, 2014. Ex. 1125 at 16. But money kept coming in from customers. On September 26, 2014, MillerCoors wired CardEx $11,600.80 (and would not see a refund). Ex. 935 at 2; 2 Tr. 360-61. On September 25, 2014, client Integra Telecomm wired CardEx $60,440; the evidence does not indicate whether a refund was issued. Ex. 935 at 2. What the evidence does show is that during the month of September 2014—as CardEx's collapse was imminent—Alan Safahi withdrew $160,000 from CardEx's Union Bank account for his personal use.

Safahi extracted $30,000 from CardEx through Bill.com, the platform CardEx used to pay expenses, including employee payroll. Ex. 1023 at 1036–38 ($5k on 9/9, $5k on 9/10, $5k on 9/17, $5k on 9/24, and $10k on 9/26). On September 23, 2014, Alan Safahi initiated a withdrawal of $80,000 from CardEx's Union Bank account via cashier's check. Ex. 960 at 9–10. 6 Tr. at 852–53. That same day, the same $80,000 Union Bank cashier's check was deposited into Alan Safahi's

United States District Court
Northern District of California

personal Citibank checking account.  Ex. 1055 at 2.

Prior to the deposit of the $80,000 cashier's check on September 22, 2014, Safahi's Citibank checking balance was $2,817.67. Ex. 1054 at 4.  After the deposit, the balance increased to $82,817.67.  *Id*.  Later that same day, $50,000 was transferred out of Safahi's Citibank checking account into Safahi's Citibank savings account, bringing the balance in the checking account down to $32,513.29.  *Id*.  The balance in Safahi's Citibank savings account grew from $211,552.21 on September 8, 2014, to $261,552.21 on September 23, 2014.  *Id*. at 5.  Another $121,00.00—from an unidentified source—was deposited into Safahi's Citibank savings account (via the checking account) on September 24, 2014, bringing the total saving balance up to $382,552.21. *Id*.

On September 25, 2014—after the $2.7 million Load Report had been sent and Safahi announced CardEx's closure—an "Outgoing Domestic Wire Transfer" of $355,000 left Safahi's Citibank savings account.  *Id*. at 5.  Evidence indicates the $355k wire went to Chicago Title Company towards the purchase a new house, now owned by Safahi, at 58 Persimmon Walk in Orinda, CA. Ex, 1055 at 1; Ex. 421 at 2, 147; 6 Tr. at 855.

Safahi continued to withdraw money from CardEx on September 25, 2014, even after announcing the company's closure.  He withdrew $50,000 from CardEx Union Bank account via a cashier's check payable to himself. Ex. 960 at 1–2.  That same $50k cashier's check was deposited into an operating account of another company owned by Alan Safahi.  Ex. 435 at 3; Ex. 451 at 57.

The amount of money Safahi took out of CardEx in the month of September 2014 far exceeded his typical withdrawal pattern in 2014.  Safahi's bank statements show incoming payments from CardEx via Bill.com in the following amounts: $20,000 in January 2014, $10,000 in February 2014, $54,000 in March 2014, $20,000 in April 2014, $10,000 in May 2014, $15,000 in June 2014, $20,000 in July 2014, and $25,000 in August 2014 (respectively: Ex. 921 at 60, Ex. 921 at 56, Ex. 921 at 50, Ex. 921 at 45, Ex. 921 at 40, Ex. 921 at 34, Ex. 921 at 28, Ex. 921 at 22–23).

The defense suggests CardEx had "retained earnings" to which Safahi was entitled as CardEx's owner. However, the admitted evidence indicates CardEx had severe cash flow problems since the inception of the Sunrise Banks sponsorship.  On November 18, 2013—the day CardEx wired $35,000 to each of Sunrise Banks and KeyBank after receiving $149,300 from The Target

Group—Safahi made clear that CardEx was undergoing severe cash flow problems. Responding to an inquiry about raising rates paid to software consultants, Safahi wrote in an email: "We can't afford a rate increase at this point. We are still losing money and have many people who don't get salaries so that we can pay your developers." Ex. 1125 at 138 (emphasis in original).

And on May 24, 2014—three days after Sunrise Banks told Safahi it suspected CardEx of underfunding cards—Alan Safahi emailed all CardEx employees informing them that their salaries would be cut in half due to CardEx "having some cash flow problems lately." Ex. 10 at 1. Then on May 27, 2014—the day before telling Sunrise Banks that "[w]e actually think we are overfunded"— Alan Safahi informed CardEx employees via email that he would be making changes to CardEx's management structure "to help us get out of this cash flow crisis we are in," including letting go of Ron Wiggins and CardEx's Chief Compliance Officer. Ex. 1125 at 56; Ex. 42 at 2.

## II. ORDER OF CONVICTION

### A. Count One: Bank Fraud 18 U.S.C. § 1344(1) - GUILTY

#### 1. Allegations in Superseding Indictment

Count One in the superseding indictment charges Safahi for bank fraud in violation of 18 U.S.C. § 1344(1), (2). The bank fraud allegation are that around June 2013, Safahi entered into an agreement with Sunrise Banks in which Safahi promised Sunrise Banks that in exchange for its sponsorship, CardEx would sell "fully funded" prepaid cards to clients[20] and remit 100% of the value of any and all cards to Sunrise Banks. Dkt. No. 110 ¶ 6. The superseding indictment alleges Sunrise Banks entered into the sponsorship agreement in reliance on Safahi's promise. *Id*. But instead of following through, Safahi:

---

[20] The indictment refers to CardEx's customers as "sponsors." To avoid confusion with "sponsor banks" and remain consistent with subsection I, this subsection refers to CardEx's customers as "clients."

United States District Court
Northern District of California

directed employees of Card Express to implement a "Funding on Demand" initiative. They did so by keeping two sets of records of the balances of the charge cards. First, at SAFAHI'S direction, Card Express employees accurately reported the prepaid charge card balances to Card Express's sponsors [*i.e.*, clients] and cardholders. These accurate numbers for each card equaled the total amount loaded minus the amount used.

Second, also at SAFAHI'S direction, Card Express employees falsely reported a different set of card balances to Sunrise Banks. Specifically, SAFAHI caused the employees to falsely report to Sunrise Banks as the total balance of the prepaid cards only the money that had actually been spent by the cardholder, and only on the day it was spent. This caused Sunrise Banks to believe that the cards Sunrise Banks sponsored had much lower balances overall than in fact they did.

*Id.* ¶ 7 (paragraph break added).  The superseding indictment alleges that Safahi, having successfully underfunded cards, "fraudulently diverted the difference between the two sets of numbers for the prepaid cards … to support Card Express's funding needs as well as to maintain his personal lifestyle," including using the diverted funds to purchase a home in the Northern District of California.  *Id.* ¶ 8.  The superseding indictment alleges that around September 24, 2014, Safahi and CardEx, succumbing to "cash flow pressure reported the true overall balance of the prepaid charge cards to Sunrise Banks, which was approximately $2,735,531.27 larger than previously reported. SAFAHI then promptly shut down Card Express, causing both Sunrise Banks and [clients] to lose money." *Id.* ¶ 9.

### 2. Elements Required to Prove Guilt

Under 18 U.S.C. § 1344(1), a person commits bank fraud if he: "[K]nowingly executes, or attempts to execute, a scheme or artifice—(1) to defraud a financial institution; or (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises[.]"  The bank fraud statute is disjunctive, permitting conviction upon proof of either section 1344(1) or 1344(2).  *United States v. Urrutia*, 897 F.2d 430, 432 (9th Cir. 1990) ("When a statute specifies two or more ways in which an offense may be committed, all may be alleged in the conjunctive in one count and proof of any of those acts conjunctively charged may establish guilt.").[21]

---

[21] The defense presents a duplicity challenge to the superseding indictment based on the

28

The Ninth Circuit's Model Criminal Jury Instruction 15.36 states that a defendant is guilty of bank fraud under 18 U.S.C. § 1344(1) if the government proves each of the following elements beyond a reasonable doubt:

(1) defendant knowingly executed or attempted to execute a scheme to defraud a financial institution as to something of value;

(2) defendant did so with the intent to defraud the financial institution; and

(3) the financial institution was insured by the F.D.I.C

The phrase "scheme to defraud" means any deliberate plan of action or course of conduct by which someone intends to deceive or cheat a financial institution and deprive it of something of value. It is not necessary for the government to prove that a financial institution was the only or sole victim of the scheme to defraud. It is also not necessary for the government to prove that the defendant was actually successful in defrauding any financial institution. Finally, it is not necessary for the government to prove that any financial institution lost any money or property as a result of the scheme to defraud.

**3. Determination of Guilt**

Based on the Special Findings of Fact set forth above, namely, that

(1) Safahi knowingly directed Wiggins and Nhong to execute funding on demand to falsely report load balances to Sunrise Banks, permitting Safahi to retain funds otherwise owing to the bank, thereby defrauding the bank of something of value;

(2) Safahi did so with the intent to defraud Sunrise Banks, as evidenced by his ownership and control of CardEx during the entirety of the funding on demand scheme, his knowledge that Sunrise Banks expected cards to be fully funded, his failure to reveal to Sunrise Banks

government's decision to include both section 1344(1) and 1344(2) in Count One. Dkt. No. 145 at 22 n. 20. The Court rejects the challenge. Despite including sections (1) and (2) of the bank fraud statute as a potential basis for liability, Count One only alleges one execution of the same scheme. *United States v. King*, 200 F.3d 1207, 1213 (9th Cir. 1999) ("our review of the indictment persuades us that the government has carefully crafted the indictment to allege only one execution of the scheme. Thus, the indictment is not duplicitous.").

the true reasons why the bank could not reconcile reports, his affirmative statements that CardEx was actually overfunding cards, the ongoing obligations arising from the KeyBank termination agreement along with CardEx's cash flow problems, and Safahi's personal cash withdrawals even after announcing CardEx's closure; and

(3) Sunrise Banks was F.D.I.C. insured, as stipulated by the parties;

the Court finds the evidence presented at trial sufficient to fairly support a conclusion that every element of Counts One has been established beyond a reasonable doubt, and therefore finds Safahi **GUILTY** as to Count one.

## B. Count Two: Wire Fraud 18 U.S.C. § 1343 - GUILTY

### 1. Allegations in Superseding Indictment

Count Two charges Safahi with wire fraud in violation of 18 U.S.C. § 1343. The wire fraud allegation incorporates the scheme to defraud described in the bank fraud count, and alleges that between June 2013 and September 2014, Safahi knowingly transmitted and caused to be transmitted interstate wires "for the purpose of executing the aforementioned scheme and artifice to defraud" described in Count One. Dkt. No. 110 ¶ 11. Count Two specifically identifies a "[w]ire transfer of $149,300 from the Target Group United Community Bank account numbered ending in 7864 to Safahi's Card Express Union Bank account numbered ending in 3419" on November 18, 2013. *Id.*

### 2. Elements Required to Prove Guilt

The Ninth Circuit's Model Criminal Jury Instructions 15.35 state that a defendant is guilty of money laundering under 18 U.S.C. § 1343 if the government proves each of the following elements beyond a reasonable doubt:

(1) the defendant knowingly participated in, devised, or intended to devise a scheme or plan to defraud, or a scheme or plan for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or omitted facts.

(2), the statements made or facts omitted as part of the scheme were material; that is, they

United States District Court
Northern District of California

had a natural tendency to influence, or were capable of influencing, a person to part with money or property;

(3) the defendant acted with the intent to defraud, that is, the intent to deceive and cheat; and

(4) the defendant used, or caused to be used, an interstate or foreign wire communication to carry out or attempt to carry out an essential part of the scheme.

In determining whether a scheme to defraud exists, the trier of fact may consider not only the defendant's words and statements but also the circumstances in which they are used as a whole.

A defendant acts with the intent to deceive when he "make[s] false statements or utilize[s] other forms of deception[.]"  *United States v. Miller*, 953 F.3d 1095, 1101 (9th Cir. 2020).  A defendant acts with the intent to cheat when he engages in "a scheme or artifice to defraud or obtain money or property" and "deprive[s] a victim of money or property" thereby "cheat[ing] someone out of something valuable."  *Id*.  A defendant must intend to both deceive *and* cheat.  *Id*.

**3. Determination of Guilt**

Based on the Special Findings of Fact set forth above, namely, that

(1) Safahi knowingly directed Wiggins and Nhong to execute funding on demand to falsely report load balances to Sunrise Banks, permitting Safahi to retain funds otherwise owing to the bank, thereby obtaining money through (a) the false or fraudulent pretense that actual loads were being reports, and (b) the false promise that CardEx would fully fund cards issued by Sunrise Banks;

(2) Safahi's promise that CardEx would fully fund cards had a natural tendency to influence Sunrise Banks to enter into the Sponsorship Agreement, Safahi's ongoing reassurances that he would fix the reporting issues had a natural tendency to perpetuate Sunrise Bank's sponsorship, and the false load reports had a natural tendency to influence Sunrise Banks to part with moneys it was otherwise due because the false reports suggested the cards were being fully funded;

(3) Safahi did so with the intent to deceive and cheat, as evidenced by his ownership and control of CardEx during the entirety of the funding on demand scheme, his directive to

create and implement the funding on demand scheme, his knowledge that Sunrise Banks expected cards to be fully funded, his failure to reveal to Sunrise Banks the true reasons why the bank could not reconcile reports, his affirmative statements that CardEx was actually overfunding cards, his ongoing obligations arising from the KeyBank termination agreement along with CardEx's cash flow problems, and Safahi's personal cash withdrawals even after announcing CardEx's closure; and

 (4) Safahi caused The Target Group to use an interstate wire to carry out an essential part of the scheme, i.e., sending $149,300 to CardEx on November 18, 2013 as part of a long-standing commercial relationship for prepaid cards;

the Court finds the evidence presented at trial sufficient to fairly support a conclusion that every element of Count Two has been established beyond a reasonable doubt, and therefore finds Safahi **GUILTY** as to Count Two.

## C. Count Three: Wire Fraud 18 U.S.C. § 1343 – GUILTY

### 1. Allegations in Superseding Indictment

Count Three charges Safahi with wire fraud in violation of 18 U.S.C. § 1343.  The wire fraud allegation incorporates the scheme to defraud described in the bank fraud count, and alleges that between June 2013 and September 2014, Safahi knowingly transmitted and caused to be transmitted interstate wires "for the purpose of executing the aforementioned scheme and artifice to defraud" described in Count One.  Dkt. No. 110 ¶ 11.  Count Three specifically identifies a "[w]ire transfer of $35,000 from Safahi's Card Express Union Bank account numbered ending in 3419 to Key Bank account numbered ending in 4288" on November 18, 2013.  *Id.*

### 2. Elements Required to Prove Guilt

The Court incorporates the elements set forth in Count Two above.

### 3. Determination of Guilt

Based on the Special Findings of Fact set forth above, namely, that

(1) Safahi knowingly directed Wiggins and Nhong to execute funding on demand to falsely report load balances to Sunrise Banks, permitting Safahi to retain funds otherwise owing to the bank, thereby obtaining money through (a) the false or fraudulent pretense that actual loads were being reports, and (b) the false promise that CardEx would fully fund cards issued by Sunrise Banks;

(2) Safahi's promise that CardEx would fully fund cards had a natural tendency to influence Sunrise Banks to enter into the Sponsorship Agreement, Safahi's ongoing reassurances that he would fix the reporting issues had a natural tendency to perpetuate Sunrise Bank's sponsorship, and the false load reports had a natural tendency to influence Sunrise Banks to part with moneys it was otherwise due because the false reports suggested the cards were being fully funded;

(3) Safahi did so with the intent to deceive and cheat, as evidenced by his ownership and control of CardEx during the entirety of the funding on demand scheme, his directive to create and implement the funding on demand scheme, his knowledge that Sunrise Banks expected cards to be fully funded, his failure to reveal to Sunrise Banks the true reasons why the bank could not reconcile reports, his affirmative statements that CardEx was actually overfunding cards, his ongoing obligations arising from the KeyBank termination agreement along with CardEx's cash flow problems, and Safahi's personal cash withdrawals even after announcing CardEx's closure; and

(4) Safahi caused CardEx to use an interstate wire to carry out an essential part of the scheme, i.e., transferring $35,000 from CardEx's Union Bank account to KeyBank's account on November 18, 2013 to pay an ongoing obligation due under the KeyBank termination agreement—the obligation that compelled Safahi to execute and implement funding on demand to secure a source of cash in the first place;

the Court finds the evidence presented at trial sufficient to fairly support a conclusion that every element of Count Three has been established beyond a reasonable doubt, and therefore finds Safahi

**GUILTY** as to Count Three.

### D. Count Four: Wire Fraud 18 U.S.C. § 1343 - GUILTY

**1. Allegations in Superseding Indictment**

Count Four charges Safahi with wire fraud in violation of 18 U.S.C. § 1343.  The wire fraud allegation incorporates the scheme to defraud described in the bank fraud count, and alleges that between June 2013 and September 2014, Safahi knowingly transmitted and caused to be transmitted interstate wires "for the purpose of executing the aforementioned scheme and artifice to defraud" described in Count One.  Dkt. No. 110 ¶ 11.  Count Four specifically identifies a "Wire transfer of $35,000 from Safahi's Card Express Union Bank account numbered ending in 3419 to Sunrise Banks account numbered ending in 9081" on November 18, 2013.  *Id.*

**2. Elements Required to Prove Guilt**

The Court incorporates the elements set forth in Count Two above.

**3. Determination of Guilt**

Based on the Special Findings of Fact set forth above, namely, that

(1) Safahi knowingly directed Wiggins and Nhong to execute funding on demand to falsely report load balances to Sunrise Banks, permitting Safahi to retain funds otherwise owing to the bank, thereby obtaining money through (a) the false or fraudulent pretense that actual loads were being reports, and (b) the false promise that CardEx would fully fund cards issued by Sunrise Banks;

(2) Safahi's promise that CardEx would fully fund cards had a natural tendency to influence Sunrise Banks to enter into the Sponsorship Agreement, Safahi's ongoing reassurances that he would fix the reporting issues had a natural tendency to perpetuate Sunrise Bank's sponsorship, and the false load reports had a natural tendency to influence Sunrise Banks to part with moneys it was otherwise due because the false reports suggested the cards were

being fully funded;

(3) Safahi did so with the intent to deceive and cheat, as evidenced by his ownership and control of CardEx during the entirety of the funding on demand scheme, his directive to create and implement the funding on demand scheme, his knowledge that Sunrise Banks expected cards to be fully funded, his failure to reveal to Sunrise Banks the true reasons why the bank could not reconcile reports, his affirmative statements that CardEx was actually overfunding cards, his ongoing obligations arising from the KeyBank termination agreement along with CardEx's cash flow problems, and Safahi's personal cash withdrawals even after announcing CardEx's closure; and

(4) Safahi caused CardEx to use an interstate wire to carry out an essential part of the scheme, i.e., transferring $35,000 from CardEx's Union Bank account to Sunrise Banks' account on November 18, 2013 under the guise of a fully funded program;

the Court finds the evidence presented at trial sufficient to fairly support a conclusion that every element of Count Four has been established beyond a reasonable doubt, and therefore finds Safahi **GUILTY** as to Count Four.

### E. Count Five: Wire Fraud 18 U.S.C. § 1343 – GUILTY

#### 1. Allegations in Superseding Indictment

Count Five charges Safahi with wire fraud in violation of 18 U.S.C. § 1343.  The wire fraud allegation incorporates the scheme to defraud described in the bank fraud count, and alleges that between June 2013 and September 2014, Safahi knowingly transmitted and caused to be transmitted interstate wires "for the purpose of executing the aforementioned scheme and artifice to defraud" described in Count One.  Dkt. No. 110 ¶ 11.  Count Five specifically identifies a "[w]ire transfer of $93,400 from the Target Group United Community Bank account numbered ending in 7864 to Safahi's Card Express Union Bank account numbered ending in 3419" on September 22, 2014." *Id.*

**2. Elements Required to Prove Guilt**

The Court incorporates the elements set forth in Count Two above.

**3. Determination of Guilt**

Based on the Special Findings of Fact set forth above, namely, that

(1) Safahi knowingly directed Wiggins and Nhong to execute funding on demand to falsely report load balances to Sunrise Banks, permitting Safahi to retain funds otherwise owing to the bank, thereby obtaining money through (a) the false or fraudulent pretense that actual loads were being reports, and (b) the false promise that CardEx would fully fund cards issued by Sunrise Banks;

(2) Safahi's promise that CardEx would fully fund cards had a natural tendency to influence Sunrise Banks to enter into the Sponsorship Agreement, Safahi's ongoing reassurances that he would fix the reporting issues had a natural tendency to perpetuate Sunrise Bank's sponsorship, and the false load reports had a natural tendency to influence Sunrise Banks to part with moneys it was otherwise due because the false reports suggested the cards were being fully funded;

(3) Safahi did so with the intent to deceive and cheat, as evidenced by his ownership and control of CardEx during the entirety of the funding on demand scheme, his directive to create and implement the funding on demand scheme, his knowledge that Sunrise Banks expected cards to be fully funded, his failure to reveal to Sunrise Banks the true reasons why the bank could not reconcile reports, his affirmative statements that CardEx was actually overfunding cards, his ongoing obligations arising from the KeyBank termination agreement along with CardEx's cash flow problems, and Safahi's personal cash withdrawals even after announcing CardEx's closure; and

(4) Safahi caused The Target Group to use an interstate wire to carry out an essential part of the scheme, i.e., transferring $93,400 to CardEx's Union Bank account on September 22, 2014 for prepaid cards, on the eve of Safahi directing Germain to reveal to Sunrise Banks the true scale of previously undisclosed loads and subsequently shutting down CardEx;

the Court finds the evidence presented at trial sufficient to fairly support a conclusion that every element of Count Five has been established beyond a reasonable doubt, and therefore finds Safahi **GUILTY** as to Count Five.


### F. Count Six: Money Laundering 18 U.S.C. § 1957 – GUILTY


**1. Allegations in Superseding Indictment**

Count Six of the superseding indictment charges Safahi with Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity in violation of 18 U.S.C. § 1957, colloquially known as "money laundering." The superseding indictment charges Safahi with purchasing "a cashier's check in the amount of $80,000 from his Card Express Union Bank account numbered ending in 3419, such funds having been derived from the specified unlawful activities of bank fraud and wire fraud." *Id*. ¶ 13.


**2. Elements Required to Prove Guilt**

The Ninth Circuit's Model Criminal Jury Instructions 18.7 state that a defendant is guilty of money laundering under 18 U.S.C. § 1957 if the government proves each of the following elements beyond a reasonable doubt:

(1) the defendant knowingly engaged or attempted to engage in a monetary transaction;

(2) the defendant knew the transaction involved criminally derived property;

(3) the property had a value greater than $10,000;

(4) the property was, in fact, derived from a "specified unlawful activity" alleged in the indictment; and

(5) the transaction occurred in the United States or in the special maritime and territorial jurisdiction of the United States.[22]

The term "monetary transaction" means the deposit, withdrawal, transfer, or exchange, in or

---

[22] A provision regarding offenses taking place outside of the U.S. is inapplicable here.

affecting interstate commerce, of funds or a monetary instrument by, though, or to a financial institution, except any transaction necessary to preserve a person's right to representation as guaranteed by the Sixth Amendment to the Constitution.

The term "criminally derived property" means any property constituting, or derived from, the proceeds obtained from a criminal offense.  The government must prove that the defendant knew that the property involved in the monetary transaction constituted, or was derived from, proceeds obtained by some criminal offense.  The government does not have to prove that the defendant knew the precise nature of that criminal offense, or knew the property involved in the transaction represented the proceeds of the specified unlawful activity alleged in the indictment.

### 3. Determination of Guilt

Based on the Special Findings of Fact set forth above, namely, that

(1) Safahi engaged in a monetary transaction by initiating a withdrawal of $80,000 from CardEx's Union Bank account via cashier's check on September 23, 2014;

(2) Safahi knew the transaction involved criminally derived property, as Safahi executed and directed funding on demand for nearly one year with knowledge that such a scheme was fraudulent, and the day after initiating the withdrawal for $80,000, Safahi told Germain it was time to "shut it down" and so directed Germain to disclose to Sunrise Banks $2.7 million in previously undisclosed loads, which did occur on September 25, 2014;

(3) the withdrawal for $80,000 involved a value greater than $10,000;

(4) the money was, in fact, derived from the funding on demand scheme alleged in Count One, as well as The Target Group's wire of $93,400 to CardEx on the day before the $80,000 withdrawal, as alleged in Count Five; and

(5) the transaction occurred in the United States;

the Court finds the evidence presented at trial sufficient to fairly support a conclusion that every element of Count Six has been established beyond a reasonable doubt, and therefore finds Safahi **GUILTY** as to Count Six.

**G. Forfeiture Allegation: 18 U.S.C. § 982(a)(1) and (a)(2)**

**1. Allegations in Superseding Indictment**

The forfeiture allegation states that upon conviction for any of Counts One through Six, Safahi will "forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(1) and (a)(2), all property, real or personal, involved in said violations, or any property traceable to such property, including, but not limited to, a forfeiture money judgment."  Dkt. No. 110 ¶ 15.  The relevant statute provides:

> (1) The court, in imposing sentence on a person convicted of an offense in violation of section 1956, 1957, or 1960 of this title, shall order that the person forfeit to the United States any property, real or personal, involved in such offense, or any property traceable to such property.

> (2) The court, in imposing sentence on a person convicted of a violation of, or a conspiracy to violate—

>> (A) section 215, 656, 657, 1005, 1006, 1007, 1014, 1341, 1343, or 1344 of this title, affecting a financial institution, or

>> (B) section 471, 472, 473, 474, 476, 477, 478, 479, 480, 481, 485, 486, 487, 488, 501, 502, 510, 542, 545, 555, 842, 844, 1028, 1029, or 1030 of this title,

shall order that the person forfeit to the United States any property constituting, or derived from, proceeds the person obtained directly or indirectly, as the result of such violation.

Having found Alan Safahi guilty of violating 18 U.S.C. § 1344, affecting a financial institution (Count One), 18 U.S.C. § 1343, affecting a financial institution (Counts Two, Three, Four, and Five), and 18 U.S.C. § 1957 (Count Six), the Court shall order forfeiture at sentencing.

**IT IS SO ORDERED**.

Dated:  June 30, 2022

_____
SUSAN ILLSTON
United States District Judge

United States District Court
Northern District of California

39