BOERSCH & ILLOVSKY LLP
Martha Boersch (State Bar No. 126569)
martha@boersch-illovsky.com
Matthew Dirkes (State Bar No. 255215)
matt@boersch-illovsky.com
1611 Telegraph Ave., Ste. 806
Oakland, CA 94612
Telephone: (415) 500-6640

Attorneys for Defendant
Alan Safahi

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>ALAN SAFAHI,<br>Defendant. | Case No. 19-cr-0404-SI<br><br>**DEFENDANT ALAN SAFAHI'S SENTENCING MEMORANDUM** |

Alan Safahi submits this memorandum for the Court's consideration in connection with his upcoming sentencing. He appreciates the Probation Office's below-guideline recommendation of 40 months and agrees with the office's recognition that a downward variance is warranted. Presentence Investigation Report ("PSR"), ECF No. 155, ¶ 97-98; PSR Sentencing Recommendation at 2.

## I. MR. SAFAHI

Mr. Safahi, 63 years old, has, up until the present charges, led a lawful life without any prior criminal history. He has proven himself to be a devoted and loving father, husband, and sibling, despite suffering from serious health complications.

Mr. Safahi was born in Tehran, Iran, where his family struggled financially for the first decade of his life. PSR ¶ 52. As a 17-year-old, he came to the United States, where he completed high school and college and eventually obtained a master's degree. *Id.* Naturally imbued with optimism and an entrepreneurial spirit, he began founding and working on his own start-up companies in the 1990s after working as a project engineer and purchasing agent for others. *Id.* ¶ 70.

Mr. Safahi's dedication to his family, especially to his wife of more than 35 years, Michelle, and to their five children, ages 32, 29, and three who are all 19, is readily apparent in the letters of support submitted on his behalf. In letters of support provided to the Probation Office, Michelle describes Mr. Safahi as a "devoted husband and father" who is active in their children's lives and has always been "so focused on his family and especially our children." M. Safahi letter. His sister-in-law, who has known him for more than 40 years, describes how Mr. Safahi "achieve[d] professional success, but never at the expense of his family values," and "took a hands-on role with his children from the time they were born," which was quite different than Mr. Safahi's own experience with his father growing up. B. Millsap letter.

Another sister-in-law writes that "Alan is an excellent father" who "puts his children above everything else in his life." C. Gutierrez letter. Mr. Safahi's brother notes that "Alan is a devoted family man" and "is an exceptional father." F. Safahi letter. Mr. Safahi's sister writes that he "is very family oriented and a constant companion for his children at all school events and extra-curricular activities." M. Kordnaij letter. When their mother was diagnosed with Alzheimer's, he

took control and helped care for her every need. *Id.* Once Mr. Safahi obtained U.S. citizenship, he moved his parents here, something his siblings were grateful for. M. Safahi letter.

Mr. Safahi's son Sean writes that his father is "the steadfast bedrock" to Sean and the family. Sean Safahi letter. Mr. Safahi has been "the anchor" to the family, willing to take their calls at any time to discuss any issues, whether "relationship struggles, late night hospital visits, or the teenage dramas that seem all consuming at the time." *Id.* Sean states that it is "the absence of formidable presence that I am most reticent to face." *Id.*

Mr. Safahi's daughter Stefanie shares a searing personal experience she suffered and the remarkable love and support Mr. Safahi showed her in response. Stefanie Safahi letter. She writes that she is "here today, drafting this letter [to the Court], because of my dad's tender tenacity." *Id.* A close friend of Mr. Safahi's son Sean describes how Mr. Safahi "is an amazing father to Sean and I have indirectly benefited from this same nurturing love." S. Melville letter.

The letters of support also reveal Mr. Safahi's generosity. His wife tells how, after her brother took his own life, Mr. Safahi was "a rock for our family," and "took care of all the legal issues, funeral arrangements, and so much more." M. Safahi letter. His sister-in-law describes how he is "very generous not only to his family but to many charitable and philanthropic causes." B. Millsap letter. Another sister-in-law describes how, in 2010, Mr. Safahi invited her and her two young children to come live with the Safahis in California after she left a difficult marriage in Arizona and was struggle financially. C. Gutierrez letter. Mr. Safahi gave her a job at his company, which allowed her to regain her financial independence and eventually move into a place of her own with her children. *Id.*

Mr. Safahi's brother recalls how Mr. Safahi hired a young graduate student who lacked the necessary experience only to watch the student excel and go on to work in key roles in large companies. F. Safahi letter. His sister tells how he "has helped friends and neighbors countless times without asking for anything in return." M. Kordnaij letter. Another brother shares how Mr. Safahi "is a caring person always looking out for the interest[s] of others both in business and in his personal life." M. Safahi letter. One of their brothers "has struggled his whole life financially and in many

other ways" and Mr. Safahi "is always the one who comes to his aid, not only with resources but with love and encouragement." *Id.*

Steve Melville, friends with Mr. Safahi's son, shares that Mr. Safahi "has become my most trusted mentor" who has "invested in helping me grow both professionally and as a person," even going so far as to create a position in his company for Steve when he was going through a career transition. S. Melville letter.

Finally, the letters of support reveal Mr. Safahi's deep sense of remorse. His wife relates that he is "extremely sorry for the mistakes he has made." M. Safahi letter. His sister-in-law notes that "Alan is sorry for the mistakes he has made and the impact this incident has had on so many people." B. Millsap letter. Mr. Safahi's brother relates that "Alan is feeling a sense of failure over this matter" and "is very remorseful." F. Safahi letter. Mr. Safahi's sister tells how she "could feel the pain in his voice as he shared the story of his crime." M. Kordnaij letter. Mr. Safahi's "remorse and contrition shined out, as he felt as if he let the entire family down." *Id.* Nonetheless, throughout this process, he was "worrie[d] more about the repercussions for the entire family more than he cares about his own wellbeing." *Id.* Mr. Safahi's daughter Stefanie notes the "lack of judgement" her father recognized in himself in connection with the offense. Stefanie Safahi letter. Mr. Safahi's remorse is especially acute given the bullying their three youngest children have suffered at school as a result of this case. PSR ¶ 57.

## II. THE GUIDELINES CALCULATION

As noted in the PSR, Mr. Safahi believes the guidelines calculation should be lower for the following two reasons. Addendum to PSR, Objections, at ECF page nos. 28-30.

### A. Loss Amount

#### 1. Legal Standard

The government bears the burden of proving any contested fact necessary to determine the base offense level under the United States Sentencing Guidelines. *United States v. Lonich*, 23 F.4th 881, 910 (9th Cir. 2022); *United States v. Ameline*, 409 F.3d 1073, 1085-86 (9th Cir. 2005) (*en*

*banc*).[1] If a defendant raises objections to factual issues in the PSR, the Court is obligated to resolve any factual dispute and cannot simply rely on the factual statements in the PSR. *United States v. Showalter*, 569 F.3d 1150, 1160 (9th Cir. 2009).

In calculating the amount of loss under the Sentencing Guidelines, the Court must "make a reasonable estimate of the loss." USSG §2B1.1, cmt. n.3(C). "[T]he fact that '[t]he court need only make a reasonable estimate of the loss,' USSG §2B1.1, cmt. n.3, §2F1.1, cmt. n.8, does not obviate the requirement to show that actual, defendant-caused loss occurred." *United States v. Berger*, 587 F.3d 1038, 1045 (9th Cir. 2009). For a district court's loss methodology to be legally acceptable, there must be a loss that was "proximately caused by the defendant." *Id*. at 1046.

"District courts generally use the 'preponderance of the evidence standard of proof when finding facts at sentencing, such as the amount of loss caused by a fraud.'" *United States v. Hymas*, 780 F.3d 1285, 1289 (9th Cir. 2015) (*quoting United States v. Treadwell*, 593 F.3d 990, 1000 (9th Cir. 2010)). But if a sentencing enhancement – such as the amount of loss – has an "extremely disproportionate" impact on the ultimate sentence, the government must prove the amount of loss by clear and convincing evidence, rather than a preponderance. *Lonich*, 23 F.4th at 910.

"[T]here is no bright-line rule for the disproportionate impact test;" instead, a district court must examine the "totality of the circumstances" using six factors first articulated in *United States v. Valensia*, 222 F.3d 1173 (9th Cir. 2000). *Id*. at 1290 (internal quotation marks omitted). Under the *Valensia* totality of the circumstances test, six factors, none of which is dispositive, guide the determination of whether a sentencing factor has a disproportionate impact on the sentence:

> (1) whether the enhanced sentence falls within the maximum sentence for the crime alleged in the indictment; (2) whether the enhanced sentence negates the presumption of innocence or the prosecution's burden of proof for the crime alleged in the indictment; (3) whether the facts offered in support of the enhancement create new offenses

[1] The government similarly bears the burden of proof to demonstrate the amount of loss a victim has suffered for purposes of restitution. 18 U.S.C. § 3664(e). The district court "is responsible for making an independent determination as to the amount of loss the victim suffered as a result of the defendant's conduct." *United States v. Najjor*, 255 F.3d 979, 984 (9th Cir. 2001).

> requiring separate punishment; (4) whether the increase in sentence is based on the extent of a conspiracy; (5) whether an increase in the number of offense levels is less than or equal to four; and (6) whether the length of the enhanced sentence more than doubles the length of the sentence authorized by the initial sentencing guideline range in a case where the defendant would otherwise have received a relatively short sentence.

*Id*. (internal quotation marks omitted).

Factors five and six weigh heavily in favor of a clear-and-convincing standard. With respect to the fifth factor, the alleged loss amount more than triples the base offense level, from 7 to 23. Regarding the sixth factor, the guidelines range for Mr. Safahi for a base offense level 7 is 0-6 months, while the range for a base offense level 23 is 46-57 months. As such, we submit that the government must prove loss amount by clear and convincing evidence, though, for the reasons discussed below, the government cannot prove loss even by a preponderance of the evidence.

**2. Loss in the Present Case**

The PSR sets forth a guideline calculation based on a loss amount of $2.7 million. The evidence before this Court does not support that number.

This number is based solely on a single report hastily generated by CardEx's system. Tr. Trans. 343. No one at trial could testify that this number was accurate or even what it was based on. *E.g*., Tr. Trans. 473 (Brian Tordsen testimony that no one at Sunrise Banks was ever able to verify that number); Tr. Trans. 281 (Stephanie Pfeifle testimony that she was never able to verify the $2.7 million number); Tr. Trans. 512 (Jonathan Germain testimony that the report "is supposed to represent the . . . total balances . . . for all cards . . . ."); Tr. Trans. 343 (Mony Nhong testimony that he could not go back and verify whether the total number was correct).

More importantly, Internal Revenue Service Special Agent Keenan Dmyterko testified that from November 2013 through September 2014, a total of $9,510,019.48 was deposited with CardEx and the total payments to Sunrise Banks from CardEx during that time totaled $7,956,000. Tr. Trans. at 866-67. As such, any difference between what CardEx received and what was owed to Sunrise Banks must have been less than $1,554,019.48, and not $2,774,953.61. (The difference must have been less than $1,554,019.48 because that number necessarily included fees legitimately owed to

CardEx by its customers under the relevant contracts as well as breakage.[2]) Although, for the reasons set forth below, the government did not prove any *actual* – as opposed to hypothetical – loss to Sunrise Banks. Even if the Court were to find that the $1,554,019.48 figure represented an actual loss to Sunrise Banks, Sunrise Banks settled with CardEx for $400,000 after the bank asserted civil claims against CardEx. Any loss to Sunrise Banks would have to be reduced by that amount.

But the $1,554,019.48 figure (less fees and breakage) is not actual loss. Rather, it represents only a *possible* or hypothetical loss. It is not an actual loss of money that Sunrise Banks in fact paid to cardholders without reimbursement from CardEx. On this point, the evidence at trial did not establish any actual loss to Sunrise Banks (let alone a loss of $2,774,953.61). Although there was potentially $1,554,019.48 (less fees and breakage owed to CardEx) in underfunded cards when CardEx ceased operations on September 24, 2014, no evidence at trial established that Sunrise Banks actually suffered any loss. As Brian Tordsen explained, the underfunded liability merely represented the potential outstanding unspent balances on the cards. Tr. Trans. 473. No loss would occur if cards were not activated or once activated nothing was spent. Tr. Trans. 156 (Pfeifle testimony that card issuance, activation and load are three different dates). Tordsen agreed that it was possible the outstanding balances would never be spent. Tr. Trans. 473-74. Tordsen also agreed that most of the unspent balances never were spent because Sunrise Banks quickly shut down all of the outstanding cards 48 to 78 hours after CardEx ceased operations. Tr. Trans. 473-74; Tr. Trans. 204:18 (Pfeifle testimony that Sunrise Banks "did an emergency shutdown of the BIN" for all of the cards). Finally, Tordsen testified that he did not know what, if any, losses the bank suffered. Tr. Trans. 471.

The only evidence about any loss to Sunrise Banks came in the form of testimony from Agent Dmyterko. Specifically, Agent Dmyterko testified that a lawyer for Sunrise Banks told him that $224,000 was spent on the cards. Tr. Trans. 896 ("Their [the bank's] attorney explained to me, when I spoke to her, that over the time period when they weren't, when Sunrise Banks wasn't getting

---

[2] As set forth in the Court's Special Findings of Fact and Order of Conviction from Bench Trial, ECF No. 150, any "breakage," *i.e.*, unspent balances on cards, would have been remitted to CardEx by the sponsor bank after the cards expired. ECF No. 150 at 4. Some unknown and unproven amount of the underfunding almost certainly would have been remitted back to CardEx as breakage. As such, it should not be included in any loss calculation.

reports, from September 19th through September 24th, there was a total of $224,000 that was spent on the cards."). That testimony, on its own and based as it is on hearsay, is inadequate to carry the government's burden of proof of loss regardless of the legal standard applied. Even if that testimony were enough to satisfy the government's burden, that loss amount would still need to be reduced by the civil settlement amount of $400,000 that CardEx paid to Sunrise Banks, meaning there would still be no actual loss.

### B. Leadership Role

Mr. Safahi should not receive a leadership enhancement. The evidence at trial was clear and undisputed that at the time CardEx entered into the contract with Sunrise Banks and until November 2013, Mr. Safahi had little to no involvement with the company. There was no evidence at trial that Mr. Safahi had any role in negotiating the contract – or even knew of it or its terms until after it had been fully executed – and he did not sign it. This is significant because the contract is the starting point for the alleged scheme to defraud. *E.g.*, Superseding Indictment, ECF No. 110, ¶ 6 (alleging Mr. Safahi induced Sunrise Banks to enter into contract with false promise of a fully funded program); *see also* ECF No. 145 at 18-30 (Safahi Post Trial Brief).[3] Given the absence of any evidence establishing that Mr. Safahi was involved with the contract negotiation or execution, and the lack of any evidence of any communications between Mr. Safahi and Sunrise Banks at the time the contract was signed, a leadership enhancement is not warranted.

In addition, the government cannot establish that Mr. Safahi satisfies the criteria for a four-level leadership enhancement under USSG §3B1.1(a). That section can be applied to a defendant who "was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive . . . ." USSG §3B1.1(a). Often, this enhancement is applied to a defendant "whose role . . . was that of organizing or leading a . . . conspiracy." *United States v. Ingham*, 486 F.3d 1068, 1075 (9th Cir. 2007). "[A]n adjustment under Guidelines §3B1.1 is based primarily on the number of people involved, . . . rather than other possible indices of the extensiveness of the activity." *United States v. Kent*, 821 F.3d 362, 369 (2nd Cir. 2016).

[3] In the press issued shortly after the indictment, the government stated that the basis for the charges was the allegation that Mr. Safahi "fraudulently entered into an agreement with a bank . . . ."

The guidelines define a "participant" as "someone who is criminally responsible for the commission of the offense, but need not have been convicted." *Id.* cmt. 1. No employees of CardEx were charged in the scheme and the government has not alleged, let alone proved, that any of those employees were criminally responsible for the alleged scheme perpetrated by Mr. Safahi.

The government therefore would need to establish that the "criminal activity" was "otherwise extensive." "The operative inquiry under the 'otherwise extensive' prong is 'whether the scheme was the functional equivalent of one involving five or more knowing participants.'" *United States v. Tang Yuk*, 885 F.3d 57, 83 (2nd Cir. 2018) (*quoting Kent*, 821 F.3d at 369). Here, the government has not proven that the alleged scheme involved five or more knowing participants.

### C. Total Offense Level

For the reasons discussed above, we believe the total offense level should be 10, rather than 30, as the government did not prove any loss to Sunrise Banks or facts sufficient to impose a leadership enhancement. (Base offense level of 7, per USSG §2S1.1(a)(1) and §2B1.1(a)(1), plus 2 for sophisticated means, per USSG §2B1.1(b)(10(C), plus 1 for money laundering, per USSG §2S1.1(b)(2)(A).) Given Mr. Safahi's criminal history score of zero, the resulting guidelines range would be 6-12 months.

## III. A SUFFICIENT AND FAIR SENTENCE

A sentence must be "not greater than necessary" to "provide just punishment," deter criminal behavior, and protect society. 18 U.S.C. § 3553(a). We believe it is clear that Mr. Safahi will never again offend and that society needs no protection from him. He accepts the possibility that he may spend time in prison as punishment for the charged fraud. In imposing a sentence, we ask the Court to ensure that a such punishment is truly "just" given the circumstances of Mr. Safahi's life and family.

Other than the instant offense, Mr. Safahi has led a lawful and productive life over the last 63 years. He is a devoted family man who is generous with his time and resources. He is a loving, supportive father to his five children, the three youngest of whom are in college and rely on him financially. His family will suffer greatly in his absence.

Any custodial sentence should also be tempered by the numerous health issues from which he suffers, including type II diabetes, high blood pressure, high cholesterol, prostate issues, psoriasis, and an apparent alcohol use disorder. PSR ¶ 60. The high blood pressure has required three brain surgeries in the past several years to remove excess blood and release pressure in the brain. *Id.* He suffers from plantar fasciitis on both feet, causing pain and making walking difficult and running virtually impossible. *Id.*

We agree with the Probation Office that, in imposing a sentence, the Court should consider Mr. Safahi's otherwise law-abiding life, "his numerous health problems and untreated alcohol addiction," his age, and his financial responsibility for his younger children and wife, and that a downward variance from the guidelines is warranted. PSR, Sentencing Recommendation at 2.

Finally, because the government has not and cannot prove a loss, no restitution order is warranted. For similar reasons, and because the government has not complied with Fed. R. Crim. P. 32.2 or proven that any property is traceable to the offense, there is no lawful basis for a forfeiture order.

## CONCLUSION

For the reasons stated, Alan Safahi respectfully requests that the Court conclude that the government has not proved any loss or facts sufficient for a leadership enhancement and, separately, find a basis for a downward variance. Mr. Safahi will make a more specific sentencing recommendation at the hearing.

DATED: January 27, 2023

BOERSCH & ILLOVSKY LLP

*/s/ Martha Boersch*
Martha Boersch
Matthew Dirkes

Attorneys for Defendant
Alan Safahi