STEPHANIE M. HINDS (CABN 154284)
United States Attorney

THOMAS A. COLTHURST (CABN 99493)
Chief, Criminal Division

ROBERT DAVID REES (CABN 229441)
BENJAMIN K. KLEINMAN (NYBN 5358189)
Assistant United States Attorneys

    1301 Clay Street, Suite 340S
    Oakland, California 94612
    Telephone: (510) 637-3680
    FAX: (510) 637-3724
    Email: Robert.rees@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. CR 19-0404 SI |
| Plaintiff, | |
| v. | UNITED STATES' SENENCING MEMORADUM |
| ALAN SAFAHI, | Sentencing Date: February 3, 2023 |
| Defendant. | Time: 12:00 p.m. |
| | Court: Hon. Susan Illston |

## INTRODUCTION

The United States respectfully submits this Sentencing Memorandum with respect to Alan Safahi following his convictions after trial of bank fraud, wire fraud, and money laundering. Specifically, the United States submits that Safahi's Guidelines are Offense Level 30, Criminal History Category I, for a Guidelines-advised range of 97-121 months' imprisonment. The United States disagrees with Probation's conclusion that a significant downward variance is appropriate for the reasons discussed below. Instead, the United States recommends a mid-range sentence of 108 months imprisonment, a $1,000,000 fine, five years of supervised release, restitution in an amount to be determined, forfeiture as deemed appropriate by the Court, and $600 in special assessments.

## STATEMENT OF FACTS

The Court is familiar with the facts of this case given that it presided over the bench trial in this matter and published a lengthy verdict and findings of fact. Put simply, Alan Safahi tricked his bank and his customers, and used his employees, so that he could line his pockets with money and live the life he felt he deserved.

Safahi victimized Sunrise Banks by repeatedly promising that he would fully fund the prepaid cards they maintained on his behalf. Instead, Safahi fooled them with numerous lies, including the FOD system, such that they were left with nearly $3,000,000 in unfunded card balance liabilities.

Safahi victimized his clients by forcing them to pay upfront for all card balances they purchased, leading them to believe that money entrusted to Safahi on their customers' behalf was protected and secure. Instead, Safahi profligately spent that money to cover his previous debts, fund his lavish lifestyle, and feather his own nest by purchasing an expensive home worth well over $1 million, *see* Ex. 421-0147. This caused severe consequences for his client-victims. *See* Montgomery Tr. at 595 ("So as that meeting wrapped up, then I had to contact Shaw, our contacts for this program; explain, basically, the cards are no longer going to work. We're having to not only create a solution for where we're going to get cards, because it's a very large, currently, program with 13,000 people participating; but then, also, our call center is being berated with assumptions that we have stolen the money. We were called thieves, liars. Our employees were completely devastated, every day going home in tears from just the constant berating of people calling in and threatening us. It was bad.").

Wilson victimized the cardholders who were promised card balances that Safahi caused to vanish, taking money from hardworking people who depended on those funds just to make ends meet. *See* Montgomery Tr. at 604 ("And then we had many people that were desperate. These were blue-collar family people. This typically was not funds for vacation. This was groceries, gas card; you know, things that made their day-to-day ends meet. There were numerous people in the -- right after -- aftermath of it that were desperate to get certain things solved. We had a dog needing lifesaving surgery. The Target Group wrote the check for that.").

Safahi victimized anyone in his orbit he could, cutting his own employees' salaries while directing them to participate in his fraud, while ripping off Sunrise Banks, his customers, and the cardholders, all while using the money to enrich himself.

## SENTENCING GUIDELINES CALCULATIONS

The United States agrees with Probation that the Guidelines should be calculated as follows:

| | |
|---|---:|
| Base Offense Level<br>§ 2B1.1(a)(1) | 7 |
| Loss over $1,500,000<br>§ 2B1.1(b)(1)(I) | +16 |
| Sophisticated means<br>§ 2B1.1(b)(10)(C) | +2 |
| Money laundering<br>§ 2S1.1(a)(1) & (b)(2)(A) | +1 |
| Organizer and leader of extensive criminal activity<br>§ 3B1.1(a) | +4 |
| **Total Offense Level** | **30** |

### A. Base Offense Level

The defendant's base offense level is seven because bank and wire fraud specifically reference § 2B1.1, *see* Appx. A, and the maximum term of imprisonment for those crimes are 30 and 20 years respectively, *see* 18 U.S.C. §§ 1344; 1343.

### B. $2,774,953.61 Calculable Loss Amount

In its comprehensive and fully supported order of conviction, this Court determined that "$2,735,531.27 … . represented the true scale of CardEx's underfunding between October 2013 and September 2014." Order of Conviction, Dkt. 150 at 24.

The defendant attempts to impeach the verdict and objects to this loss amount as "potential and unrealized loss." PSR Addendum ¶ 4. Nevertheless, the Court's determination represents actual loss. Whoever may have ultimately borne responsibility for those funds downstream--which appears to have been a combination of Sunrise Banks, Safahi's clients such as Target Group, and the cardholders themselves—this is the true and accurate accounting of the money Safahi collected from clients to put onto cardholders' balances compared to the much smaller amount of money he fraudulent submitted to Sunrise Banks as part of his FOD scheme to underreport those balances. That money was real cash, collected by him from his clients, and siphoned off for his own purposes as the object of the fraud.

Indeed, the figure comes from *Safahi's own accounting* of the loss. *See* Dkt. 150 at 24 (describing Germain email accounting for load shortfall of $2,735,531.27); 25 (finding Germain sent the email at Safahi's direction). The defendant has no basis to question his own bookkeeping, down to the penny, of the actual loss he caused.

The defendant says this loss may not have been borne by Sunrise Banks if the card balances had never been spent. *See* PSR Addendum ¶ 4. This, of course, ignores Safahi's own clients from whom he had received full funding of the card balances. *See, e.g.,* Dkt. 150 at 9-10 (Sect. I.B.1, entitled, "CardEx's Clients Pay in Full for Prepaid Cards"). Given Safahi's continued lack of remorse or admission of any wrongdoing, it is not surprising he would deny victimhood to the very clients who trusted him to fully fund their cards by continuing to ignore their plight and denying the money he received from them. But it cannot change the straightforward facts as found by the Court: Safahi took 100% of the money from his clients to fund cardholders' cards, passed on $2,753,531.27 less to Sunrise Banks, and kept the remainder for himself. *See generally* Dkt. 150. Thus, the actual loss he caused was $2.7 million.[1]

Even if there were uncertainty regarding Safahi's accounting of his underfunding, it would not change the Guidelines calculation in this case. The Guidelines define loss as "the greater of actual loss or intended loss," with intended loss defined as "the pecuniary harm that the defendant purposely sought to inflict." § 2B1.1 Commentary Note 3(A) & (A)(ii). As the Court explained in its order of conviction, Safahi's use of FOD fraudulently to underfund his liability to the bank "meant Sunrise Banks, as settlement agent, was potentially on the hook for $2.7 million in spends—but the bank did not have those funds." Dkt. 150 at 24. This is, at the very least, is the dollar loss Safahi purposely *intended* to pass on to others, regardless of who they may have ended up being.

Whoever ultimately suffered the actual $2.7 million monetary loss Safahi intentionally created through his underfunding scheme—and even if all of that loss did not come to actual fruition (which it did given his upfront collection of card balances from his clients)—he intended to make off with that

---

[1] Though not specifically stated in the defendant's objection, any argument regarding fees Safahi may have felt entitled to earn cannot offset this loss as the evidence showed and the court found that fees were paid and tracked separately from the card balances representing this $2.7 million in losses. *See* Dkt. 150 at 16 (discussing the separate "Fee Report" and "Load Report").

$2.7 million and leave anyone and everyone else holding the bag. As the Ninth Circuit has made clear, amounts that "*would have been paid*" pursuant to a fraud scheme can be included in an intended loss calculation regardless of whether they actually were paid. *United States v. Torlai*, 728 F.3d 932, 942 (9th Cir. 2013) (emphasis in original).[2]

Indeed, the evidence establishes that Safahi *believed* the bank would pay for all of the shortfall he fraudulently created, whether they had the funds to cover the card balances or not. *See* Wiggins Tr. at 1012-13 (Q: Around this time, around September 2014, when CardEx was either just going out of business or just about to – A: Yeah. Q: -- did you receive a communication from Mr. Safahi about what might happen with such an act? A: Yes. Q: All right. What did he tell you? A: He contacted me by telephone, as I recall, and asked my opinion as to what would occur if CardEx ceased operations and, therefore, was no longer processing authorization requests, approving or declining or settling transactions. Q: And what did you tell him? A: I told him that I believe the sponsor bank would attempt to do their best effort to fill in and honor the card balances for the customers in one way or another. Q: Even if they didn't have the money? A: Correct. Yeah."); *see also* Ex. 1125-0001 (email from Keller-Heikkila, sent at Safahi's direction, telling cardholders to "contact the sponsor bank, Sunrise Banks, N.A., at 605-231-4591 regarding your prepaid card").

So even if Sunrise Banks did not actually suffer the loss represented by the entirety of Safahi's shortfall, and even if, fancifully, no one at all did, Safahi intended to cause pecuniary harm in the total amount of that shortfall. Such intended loss is sufficient both under the Guidelines and the law to hold him accountable for that amount. *See* § 2B1.1 Application Note 3(A)(ii); *United States v. Santos*, 527 F.3d 1003, 1009 (9th Cir. 2008) (holding counterfeit defendant accountable for intended loss for entire face value of stolen checks even though he had not sought or received their full value).

Accordingly, the overall quantifiable loss caused by the defendant is $2,753,531.27, which

---

[2] The defendant's claim to future, unspecified breakage is particularly specious. Not only do the Court's findings reject the premise that he was entitled to such breakage from the funds he collected, *see* Dkt. 150 at 11 (finding that funds sent from clients to CardEx for card balances "was not CarEx's money to spend"), but the verdict also explicitly denies that CardEx had any "retained earnings" at all, *see* Dkt. 150 at 26. And, of course, Safahi shut down CardEx at the end of his scheme in order to make off with his ill-gotten gains, such that there was no legitimate entity in existence to provide services to cardholders or to receive any theoretical and unsubstantiated future breakage. *Cf.* § 2B1.1 Application Note (3)(E)(1) (allowing offsets for certain "services" but only from "before the offense was detected").

results in a Guideline enhancement of plus 16.  *See* § 2B1.1(b)(1)(I).

      C.      **Sophisticated Means**

The defendant directed multiple people, including software engineers, along with the expenditure of substantial resources, to create the elaborate, meticulous, and complex FOD reporting system, separate and apart from the "true" eCAP record-keeping system he previously maintained, in order to perpetrate his fraud.  *See generally* Dkt. 150.  The defendant does not object to this enhancement.  *See* PSR Addendum.  Accordingly, there is a Guideline enhancement of plus two.  *See* § 2B1.1(b)(10)(C).

      D.      **Section 1957 Conviction**

The defendant was convicted of money laundering in violation of 18 U.S.C. § 1957.  *See* Dkt. 150 at 37-38.  Accordingly, he is subject to a Guideline enhancement of plus one.  The defendant does not object to this enhancement.  *See* PSR Addendum.  *See* § 2S1.1(b)(2)(A).

      F.      **Organizer and Leader of Extensive Criminal Activity**

The defendant was the CEO and leader of CardEx, the entity he used to commit the fraudulent scheme of which he has been convicted.  As noted above and found by the Court, the scheme involved the creation and implementation of the complex FOD system in order to trick Sunrise Banks into believing the cardholder balances were much smaller than they actually were.  This required the knowing involvement of Safahi himself, at least five of his subordinates who testified at trial, Ron Wiggins, Tom Cleveland, Kelly Keller-Heikkila, Mony Nhong, and Jonathan Germain, and at least one subordinate who did not testify, Sean Safahi.

The Court noted that at least one witness denied criminal liability.  *See, e.g.,* Dkt. 150 at 15 (Nhong).  At the same time, all of the testifying witnesses admitted knowing that the FOD system was intended to present card balance reports to Sunrise Banks that differed from the actual balances, and Germain received a form of immunity in connection with his testimony.  Ex. 35.  Safahi was the undoubted leader of CardEx and all of the people above who he employed.  *See* Dkt. 150, Section I.A.2, entitled, "Alan Safahi Owned and Controls CardEx Despite Sean Safahi's Tenure as CEO."  Because Safahi was the organizer of CardEx, and the leader of the numerous employees—at least four others, but clearly more— that he directed to commit his fraud, he is subject to a four point enhancement under § 3B1.1(a).  *See, e.g.,* Dkt. 150, Section I.B.3, entitled, "Safahi Directed the Creation of Funding on

Demand" (discussing Safahi's direction of Wiggins, Nhong and others relating to FOD).

Even if Safahi's employees were completely unaware of the illegal activity he caused them to help commit, the enhancement would still apply. *See* § 3B1.1 Application Note 3 ("Thus, a fraud that involved only three participants but used the unknowing services of many outsiders could be considered extensive."). Safahi used numerous employees and contractors to create the critical FOD system that he had neither the experience nor ability to implement himself. That use of others, and the difficulties it provided to his employees from the outset of the fraud all the way through their testifying at trial about it, even if unbeknownst to them at the time, qualifies his fraud as extensive and subjects him to this enhancement.

Safahi objects to this enhancement on the sole basis that he did not sign the contract with Sunrise Banks, but instead had his son do that for him. *See* PSR Addendum ¶ 6. Safahi's attempt to pin his transgressions on his own son has been expressly rejected by this Court in its verdict. *See* Dkt. 150, Section I.A.2, entitled, "Alan Safahi Owned and Controls CardEx Despite Sean Safahi's Tenure as CEO." Indeed, Safahi's knowing use of his son both to help commit his crimes and then later to obfuscate his guilt are not only reprehensible, but provide further evidence that his fraud scheme was, in fact, extensive. *See* Dkt. 150 at 15-16 (describing Sean Safahi's directive to Wiggins not to use FOD, and Alan Safahi's later instruction to use FOD and explanation that "Sean was doing that to cover himself, to shield himself from involvement in it").

## SENTENCING RECOMMENDATION

The Guidelines in this case recommend a reasonable sentence, albeit a high one for a first-time offender. But they do so for a reason: Safahi's crimes were serious, sophisticated, and caused nearly three million dollars in paid cardholder funds to be fraudulently redirected into his pocket in a short period of time off the backs of unsuspecting victims who had believed the defendant's representations. The nature and characteristics of the offenses Safahi committed are akin to some of the more serious financial crimes prosecuted in federal court. The pervasiveness and sustained pace of the defendant's serial misconduct surrounding his pre-paid card business against, for example, Key Bank, culminating in his outright criminal fraud against Sunrise Banks and his own customers and cardholders are remarkable. The fact that he has accepted no responsibility at all for his crimes, and appears to believe

he was entitled to do what he did, makes those crimes even more nefarious.

The history and characteristics of the defendant are likewise remarkable, and it is here where the United States parts ways substantially with U.S. Probation's recommendation. Safahi has had a good life, with enough advantages that he scores nearly the lowest possible grade for assessment of adverse childhood experiences. *See, e.g.,* PSR ¶ 63. He has a Master's Degree, been married, and had numerous children. There are few circumstances in his background to help explain why he would undertake such damaging courses of criminal conduct. Indeed, while his family may have been affected by the revolution in Iran in 1979, he himself has been in the United States since 1977. PSR ¶ 52. He has no mental or physical health conditions unusual for a man of his age. *See* PSR ¶ 60-61. Although he reports issues with alcohol, these only began to get more serious *after* he committed his crimes by his own admission. PSR ¶ 64. Safahi willingly chose to commit these crimes out of nothing more than greed because nothing else about his background can explain this extensive and sustained course of criminal conduct.

Probation's recommendation of 40 months is about 60% below the low-end of Safahi's Guidelines-advised sentence and more than 50% lower than the median sentence for similar offenders. *See* PSR p.26. Probation justifies its extraordinarily low recommendation on Safahi's unremarkable health conditions, age, and alcohol use, along with his lack of criminal history, which is already explicitly factored into the Guidelines. *See* PSR ¶ 98. Respectfully, Probation has unfortunately missed the mark here, having appeared to fall victim to the types of vague justifications that frequently attend white collar sentencings. It is not at all unusual to have health conditions at the age of 62, nor does age or the defendant's health issues, such as they are, bear any meaningful relationship to the crimes at issue and the remarkably short sentence Probation has recommended. Given that Safahi appears to have suffered from all such health conditions during the commission of this offense, they are, if anything, aggravating factors, suggesting they did not prevent him from committing his crimes and, indeed, suggest he may seek to commit such crimes again, particularly given his utter lack of remorse or acceptance of responsibility for them.

Had Safahi admitted his crimes, expressed remorse for them, and undertaken steps to address whatever may have contributed to them in ways that would suggest he would never do anything of the

UNITED STATES' SENTENCING MEMORAMDUM
CASE NO. CR 19-0404 SI

8

like again, and that this was truly aberrant behavior, may have justified a more lenient sentence. But that is not at all what Safahi has done. He has used his son and his employees as shields, he denies having done anything wrong at all, and attributes his health conditions not to his conduct, but to the stresses this prosecution has caused him – as if he is the victim. *See, e.g.,* PSR ¶ 62. The presence of so much current wealth also puts into real question not only whether that money may represent further ill-gotten gains, or that he is capable of making money without resorting to fraud. That he committed the serious fraud in this case despite those apparent abilities should cause grave concern to the Court that he will strike again.

As noted, the PSR reveals a great deal of unexplained wealth on Safahi's part, a truly astonishing financial portrait of a person who has retained counsel to take him all the way through trial and beyond. Safahi possesses *five* separate late-model vehicles, including a luxury $58,000 2023 BMW, and spends nearly $24,000 per month. PSR ¶ 61. These are vast indicators of wealth for a convicted fraudster who is a "self-employed managing director" of an eponymous company. PSR ¶ 68. That job title is not much different than the one he deployed with CardEx in perpetrating this very fraud, and it is reasonable seriously to question the legitimacy of such earnings given Safahi's history and conduct. At the very least, such wealth supports a fine at the very top of the Guidelines' recommends of $1,000,000, which the United States supports.

Safahi must be imprisoned for a period sufficient for his sentence to reflect the seriousness of his fraud and the sheer number of people he ultimately victimized to perpetrate it – including the cardholders whose money he fraudulently obtained. § 3553(a)(2). Only a lengthy prison sentence can provide just punishment for his offenses and afford adequate deterrence to both his criminal conduct underlying the case, his deflection to others, including his son, and his disturbing lack of contrition. *Id.* There is nothing to suggest that a variance below the Guidelines-recommended sentences based on any issues cited by Probation is warranted, much less the huge reduction they suggest. *Id.*

Indeed, it is just the opposite. Safahi's behavior makes clear that the public must be protected from his because his own actions have proven beyond any doubt that *he* will not be the one to cease his criminal activity. If lying to others to obtain money and cover up crimes is acceptable and "normal" to him, as he continues to maintain, he must be incarcerated in order to "protect the public from further

crimes" he will inevitably commit with such a mindset. § 3553(a)(2)(C).

The Guidelines are thoughtfully considered efforts to help provide uniformity in, and guidance for, sentencing decisions such as this one. While they are only a starting point, its designers have gone to great pains to try accurately and reasonably to assess a wide variety of criminal conduct to achieve the important goals both "to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct" and to "impose a sentence sufficient, but not greater than necessary" upon criminal defendants. § 3553(a).

The Guidelines in this case recommend a substantial amount of prison time for Safahi. But that is because his crimes were extensive, haunting numerous others, and representing millions of dollars of money he obtained for his own purposes, including his home. And there is almost nothing to mitigate them. There was no good reason to perpetrate this fraud, no good reason in anything in this defendant's life to lessen or explain his motivations or qualify the severity of the results of his conduct besides pure, unadulterated greed. The Guidelines can get it wrong, but they can also get it right. And the statistics provided by Probation show that they closely align with real-world sentencing results in such circumstances, with the median prison sentence for offenders such as Safahi barely a more than a year below the low-end of the Guidelines and more than twice Probation's recommendation. PSR p.26. To the extent the Court is persuaded by the reasons supporting Probation's recommendation for a lower sentence, a mid-range sentence sufficiently takes them into account.

Accordingly, the United States recommends that Safahi be sentenced to 108 months of imprisonment, five years of supervised release, a $1,000,000 fine, restitution to be determined at a future hearing as per 18 U.S.C. § 3664(d)(5), forfeiture as deemed appropriate by the Court, and $600 in special assessments.

Dated: January 27, 2023

Respectfully submitted,

STEPHANIE M. HINDS
United States Attorney

/s/
_____
ROBERT DAVID REES
BENJAMIN K. KLEINMAN
Assistant United States Attorneys